UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

FILED - GR
March 28, 2025 1:00 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW SCANNED BY: JW 3-28

UNITED STATES OF AMERICA,
Plaintiff,

v.

SAMUEL ALEXANDER KUHL,
Defendant.

Case No. 1:23-cr-44

Hon. Jane M. Beckering

Oral Argument Requested

# MOTION TO DISMISS INDICTMENT

Defendant Samuel Kuhl, proceeding pro se, respectfully moves this Court to dismiss the pending indictment. This is based on the grounds that (i) Congress nor the federal government was granted authority to define and punish felonies or other crimes under Article 1, §8 Clause 3 or 18; (ii) private communications, whether by phone or internet were not intended to be punished under the Commerce Clause; (iii) 18 U.S.C. §§ 2251(a) and 2422(b) are unconstitutional in that they reach outside of Congress's granted powers; (iiii); Both statutes lack an interstate commerce nexus as applied to Mr. Kuhl.

The attached Memorandum provides support for this motion.

Respectfully Submitted,
S. Kuhl March 19, 2025
S. Kuhl 61189510

# MEMORANDUM

## I. CONGRESS/FEDERAL GOVERNMENT LACKS THE AUTHORITY TO DEFINE AND PUNISH FELONIES UNDER ARTICLE 1 § 8 CLAUSE 3 OF THE U.S. CONST.

### A. Legal Standard

"The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45 pp. 292-93 (C. Rossiter ed. 1961). Legislative history is neither necessary nor sufficient with respect to Article 1 analysis. U.S. v. Morrison, 529 U.S. 598, 612-614 (2000).

Article 1 § 8 Clause 3 states Congress shall have power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". Clause 6 states that Congress shall have power "[t]o provide for the Punishment of counterfeiting the Securities and current Coin of the United States". Clause 10 states Congress shall have power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations".

### B. Argument

As quoted above, James Madison wrote the powers delegated

to the federal government are "few and defined." While defining and punishing felonies that fall under the reach of the Commerce Clause has been ~~long~~ historically accepted, it is an erroneous acceptance.

The Framers were not merely engaging in wordplay when creating the Constitution. They sought to set forth strict and definite guidelines to prevent tyranny and oppression that they suffered at the hands of the English government. Nothing in the Commerce Clause specifies giving power to define and/or punish crime, and such authority is not synonymous with the word regulate due to the context and other Clauses within Art. 1 §8. As noted above, Clauses 6 and 10 specified the power to provide Punishment and to define and punish Piracies and Felonies, however such powers were not defined in the Commerce Clause. It should not be taken lightly the clear distinction between the Framers' choice of words in Clauses 3, 6, 10. To regulate did not mean to punish in the sense of criminal liability as America is a country founded on the fundamental principles of freedom, liberty, and separation of powers.

It is Randy E. Barnett who seems to touch on this clear logic in The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101 (2001). "The U.S. Supreme Court, in recent cases, has attempted to define limits on the Congress's power to regulate commerce among the several states. While Justice Thomas has maintained that the original

meaning of 'commerce' was limited to the 'trade and exchange' of goods and transportation for this purpose, some have argued that he is mistaken and that 'commerce' originally included any 'gainful activity.' Having examined every appearance of the word 'commerce' in the records of the Constitutional Convention, the ratification debates, and the Federalist Papers, Professor Barnett finds no surviving example of this term being used in this broader sense. In every appearance where the context suggests a specific usage, the narrow meaning is always employed. Moreover, originalist evidence of the meaning of 'among the several States' and 'To regulate' also supports a narrow ~~meaning~~ reading of the Commerce Clause. 'Among the several States' meant between persons of one state and another; and 'To regulate' generally meant 'to make regular' - that is, to specify how an activity may be transacted - when applied to domestic commerce, but when applied to foreign trade also included the power to make 'prohibitory regulations.' In sum, according to the original meaning of the Commerce Clause, Congress has power to specify rules to govern the manner by which people may exchange or trade goods from one state to another, to remove obstructions to domestic trade erected by states, and to both regulate and restrict the flow of goods to and from other nations (and the Indian tribes) for the purpose of promoting the domestic economy and foreign trade."

Originally, commerce meant trade or the exchange of goods and Congress was granted power to make such trades or exchanges

fair and obstruction free. To regulate them or make them regular, not even to prohibit what trades could consist of as to the merchandise. Unless piracy or counterfeiting, crimes were defined and punished by the states even if someone stole from a merchant who traded among the several states or killed him. Laws made to regulate commerce were not criminal in nature as such power was not definitively given to Congress under Article 1 §8, neither by Clause 3 or 18. Look at the context "Regulation" is used in Clause 14. It refers to "land" and "naval Forces" which was to be governed by "rules." Here again, Regulation is used in the sense of maintaining proper and regular operation, not to criminal punishment. So even though the Necessary and Proper Clause granted Congress powers to make all Laws necessary to carry into Execution the "regulation" of commerce, "regulation" was never meant to define and punish crimes; this power was left to the states except for counterfeiting, Piracies and Felonies committed on the High Seas and Offences against the Laws of Nations, not Laws of the Union. Indeed there were to be no criminal Laws of the Union in regards to "trade" or "commerce."

It seems the Supreme Court first defined Congress's commerce power in Gibbons v. Ogden, 9 Wheat 1 (1824). New York had passed a law granting two male New Yorkers exclusive navigation of the waters within the jurisdiction of New York for 20 years. Gibbons was not one of the men given exclusive navigation under the New York law, but was still operating two steam boats between New York and Elizabethtown,

New Jersey. A New York Court granted injunction prohibiting Gibbons from ~~opering~~ operating his vessels in New York waters, despite Gibbon's boats being licensed under an act of Congress entitled, 'An act for enrolling and licensing ships and vessels to be employed in the coasting trade and fisheries, and for regulating the same.' The Supreme Court stepped in and declared New York's law granting exclusive navigation to two people was not in line with the U.S. Constitution and laws, and invalidated the injunction against Gibbons.

For nearly a century after Gibbons, the Supreme Court's Commerce Clause decisions dealt but rarely with the extent of Congress' power, and almost entirely with the Commerce Clause as a limit on state legislation that discriminated against interstate commerce. More support that "regulate" in the context of the commerce Clause did not mean to define & punish crimes can be found in the Virginia and North Carolina ratification conventions where they proposed that the Constitution be amended to state: "That no navigation law, or law regulating commerce, shall be passed without the consent of two thirds of the members present, in both houses." Elliot, ed, 3 Debates in the Several State Conventions at 660 (cited in note 100) (Virginia proposal); Elliot, ed, 4 Debates in the Several State Conventions at 245 (cited in note 90) (North Carolina proposal). Navigation referred to the high seas which Congress was already granted the power to define and punish crimes committed upon, therefore it would be noo need to ask for laws relevant to

regulation if regulation encompassed punishing and defining crimes.

The Constitutional Convention rejected language proposed by Gunning Bedford of Delaware that would have given Congress power "to legislate in all Cases for the general Interests of the Union, and also in those Cases to which the States are separately incompetent, or which in the Harmony of the United States may be interrupted by the Excercise of individual Legislation." Farrand, ed., 2 Records of the Federal Convention at 131-32 (cited in note 119). Despite this language being rejected at such a fundamental proceeding, this is exactly what is now occurring today and being masqueraded as necessary and proper to regulate commerce among the several States, although the conduct being punished is so far attenuated from actual interstate commerce the Framers would be appalled.

While this broad expansion of federal police power under the Commerce Clause has been almost untouched for at least 80 years, it is seriously under attack. See United States v. Lopez, 514 U.S. 549 (1995); Alderman v. United States, 562 U.S. 1163 (2011) (Thomas, J. dissenting); United States v. Morrison, 529 U.S. 598 (2000); Gonzalez v. Raich, 545 U.S. 1 (2005) (Thomas, J. dissenting); Jones v. United States, 529 U.S. 848 (2000).

It seems the federal government exceeded its powers under guise of the Commerce Clause to prescribe criminal penalties beginning with the Sherman Antitrust Act and continued by enacting The Mann Act, The Harrison Narcotics Act, and The National Motor Vehicle Theft (Dyer) Act until coming to the overwhelmingly arbitrary reach of the

unconstitutional federal police power today. Truly, and consistent with the language throughout Article 1 §8 of the U.S. Constitution, the power to define and punish criminal law was never granted to Congress and the Federal government.

It is this Court's duty to uphold the Constitution and declare that the two criminal statutes Mr. Kuhl is accused of violating, cannot be upheld because they are beyond the federal government's power. While almost a century of stare decisis goes against such a drastic remedy, there is over a century's stare decisis between the founding and almost into the 20th Century. Erroneous precedent need not be dated or widely criticized to warrant overruling. United States v. Dixon, 509 U.S. 688, 711-12 (1993); see also Gamble v. United States, 139 S. Ct. 1960 (2019) (Thomas, J. concurring fn. 2) ("By legislating beyond its limited powers, Congress has taken from the People authority that they never gave. U.S. Const., Art. 1 §8; The Federalist No. 22, p. 152 (C. Rossiter ed. 1961) ('all legitimate authority' derives from 'the consent of the people'). And the Court has been complicit by blessing this questionable expansion of the Commerce Clause. See, e.g., Gonzalez v. Raich, 545 U.S. 1, 57-74 (2005) (Thomas, J., dissenting) ("Indeed, it seems possible that much of Title 18, among other parts of the U.S. Code, is premised on the Court's incorrect interpretation of the Commerce Clause and is thus an incursion into the States' general criminal jurisdiction and an imposition on the People's liberty"); Payne v. Tennessee, 501 U.S. 808,

828 (1991) ("Stare decisis is not an inexorable command."); Alleyne v. United States, 570 U.S. 99, 116, n.5 (2013) (holding that adherence to precedent is weakest in cases "concerning procedural rules that implicate fundamental constitutional protections."). In Gamble, Justices Thomas and Gorsuch reproved vehemently the blind obedience to stare decisis even though Thomas concurred and Gorsuch dissented in the overall judgment.

As Madison wrote in Federalist No. 45: "The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." "Under the Articles of Confederation, the states had 'fettered, interrupted, and narrowed' the flow of commerce from one state to another by protective legislation of all sorts. Apart from the need to negotiate treaties of commerce with other nations, the principal purpose for adopting a new Constitution was to deprive the states of the power to interfere with productive exchanges." Original Meaning of the Commerce Clause, p. 133. Adding the Commerce Clause was never intended to grant the Federal government a police power. "[C]ourts of the United States have not jurisdiction derived from the common law to define and punish criminal offenses." United States v. Hudson, 11 U.S. 32, 7 Cranch 32 (1812).

The arbitrary and excessive police power being exerted by Congress runs afoul of the separation of powers principle and the Tenth

Amendment. "While the Tenth Amendment has been charactized as a 'truism,' stating merely that 'all is retained which has not been surrendered,' it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." Fry v. United States, 421 U.S. 542 (1975) (quoting United States v. Darby, 312 U.S. 100, 124 (1941)). Almost every criminal law of the United States, including the two Mr. Kuhl is alleged to have violated, have a correspoing state law prohibiting and punishing the same conduct. Moreover, these crimes, especially in regards to the allegations and circumstances of this case, are not crimes involving "commerce" as the term was originally meant to apply. Mr. Kuhl is already being prosecuted in the State of Michigan for the same alleged conduct and minor victim; this prosecution was brought before the federal indictment and the government was aware of these ongoing proceedings but decided to disrupt them and further opress Mr. Kuhl and deprive him of Due Process, Speedy Trial, and other lawful rights afforded to him in the Michigan criminal justice system. (See Ex 1)

For these reasons the indictment against Mr. Kuhl must be dismissed. Congress has the power to regulate commerce only among the several States, not to define and punish felonies or prohibit commerce.

## II. THE STATUTES MR. KUHL IS ALLEGED TO HAVE VIOLATED ARE INVALID FACIALLY AND AS APPLIED

### A. Legal Standard

"First, we reject the Court's division of the Commerce Clause into the 'channels,' 'instrumentalities,' and 'substantially affects' categories. Each of these classifications is almost infinitely elastic, and to the extent that Lopez imposes an outer limit on the third category, Congress can easily evade it by relabeling a "substantially affects' statute as a 'channels' one." Nelson, Pushaw, Rethinking the Commerce Clause: Applying First Principles to Uphold Federal Commercial Regulations But Preserve State Control Over Social Issues, Univ. of Iowa, 85 Iowa L. Rev. 1 (1999). Assuming Congress does have power to enact laws to define and punish crime, the broad categorical approach is inconsistent with strict limits on the federal government's power under the Commerce Clause. Although Nelson and Pushaw are incorrect in their understanding of the word "commerce" as "any gainful activity," even they recognize the unconstitutional overreach by the federal government under the Commerce Clause today. See the previously mentioned work of Randy E. Barnett, Original Meaning of the Commerce Clause.

Looking into the depth of how the term "commerce" was applied since the birth of this great Nation, one will agree with many, including

Justice Clarence Thomas, Defendant, and numerous legal scholars, that "commerce" was meant to apply to trade "among the several States," or in other words between persons of one state and another. "I... observe that our case law has drifted far from the original understanding of the Commerce Clause.... [W]e ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our more recent caselaw and is more faithful to the original understanding of that Clause." Lopez, 514 U.S. at 584. (Thomas. J., concurring) Justice Thomas went on to state that the "substantial effect" approach, "if taken to its logical extreme, would give Congress a 'police power' over all aspects of American life.... Indeed, on this crucial point, the majority and Justice Breyer agree in principle: The Federal Government has nothing approaching a police power."

If this Court deems that Congress does have the power to define and punish crimes under the Commerce Clause and Necessary and Proper Clause, still the statutes Mr. Kuhl is alleged to have violated "obliterate the distinction between what is national and what is local and create a completely centralized government." Jones & Laughlin Steel Corp., supra at 37, 57 S. Ct. 615 (1937). Originally manufacting or agriculture was distinguished from "commerce" and thus the regulation of either exceeded the powers of Congress. United States v. E.C. Knight Co, 156 U.S. 1, 12 (1895).

The commerce power "does not comprehend the purely internal domestic

commerce of a State which is carried on between man and man within a State or between different parts of the same State." Kidd v. Pearson, 128 U.S. 1, 17, 20-22 (1888). The Supreme Court began the effects test to determine if the activity sought to be regulated was "directly" or "indirectly" effective on interstate commerce in the case ALA Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935). In Schechter, the Court struck down regulations that fixed the hours and wages of people employed by a New York because the activity being regulated related to interstate commerce indirectly. The fact that the Court even accepted such an analysis, disregarded the strictly defined powers given to Congress to regulate commerce "among the several States" and started to expand the power to regulate "activity that directly effected interstate commerce."

It seems as if 18 U.S.C. §2251(a) is considered to inherit its interstate commerce nexus under both the "effects" test and the "channels" category according to government and judicial decisions. §2251(a) it seems may also be construed by the government and courts to meet the "instrumentalities" category also. Due to these categories being so broad and intertwined with one another they are essentially interchangeable as Nelson and Pushaw noticed in their Iowa Law Review mentioned previously. Meanwhile, §2422(b) seems to fall under the "channels" and/or "instrumentalities" categories. Each of these statutes will be analyzed further along in this motion, but it should be noted that, while Congress'

decision to enact a statute must be examined in "light of the grave national crisis" with which they were confronted when such statute is challenged, such examination "necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power." Schechter Poultry Corp. at 528.

The Schechter case was rooted in the poultry market and concerned a New York slaughterhouse deeply involved in that market. At the time, New York City was the largest live poultry market in the U.S., making up 96%. Still, because the business, and trade (which is actual "commerce") the Court held that it did not directly effect interstate commerce because it was an intrastate business acting within the State of New York.

In the case of NLRB v. Jones & Laughlin Steel Corp (1937) the Supreme Court has considered itself departing from the distinction of "direct" and "indirect" effects on interstate commerce test established in Schechter. See Lopez, 514 U.S. at 555. However, the Court still held that in upholding the National Labor Relations Act, Congress was authorized to regulate intrastate activities that "have such a close and substantial relation to interstate commerce," because "their control is essential or appropriate to protect that commerce from burdens and obstructions." Id., at 37. While direct effect was broadened to substantial, it is of utmost importance to look at the context of which the Court applied the "substantial effect" test. The matter at hand, the National Labor

Relations Act was established to prevent, discrimination against and unfair treatment of employess that inherently would cause obstruction to the free flow of commerce. This was in place for business corporations and thus inherently its assurance that it was being organized and operated properly was important to business or the exchange and trade of goods ("commerce"). It did not involve intrastate communications, violence, relations, or theft, especially when such activities were private matters between individuals that were not commercial in nature. Moreover, Jones & Laughlin was the fourth largest producer of steel in the United States and was so integrated in commerce among multiple states it was clearly engaged directly with interstate commerce. It would be absurd to think Congress was without authority to regulate the fairness and competency of such a National business's employing operations. Cases of a similar context and ruling that helped paved the way for the "substantial effects" category are United States v. Darby, 312 U.S. 100 (1941) (dealing with the Fair Labor Standards Act) and United States v. Wrightwood Dairy Co., 315 U.S. 110 (1942) (dealing with fixed prices of milk under the Agricultural Marketing Agreement Act). All of these cases deal with businesses and commerce or the exchange and trade of commodities or other goods, not private matters between two people in no way related to business or commerce.

Congress' "power to regulate commerce ... has limits" that this "Court has ample power" to enforce. Maryland v. Wirtz, 392 U.S. 183, 196

(1968). "Neither here nor in Wickard has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities," id., at 197, n. 27. Accordingly, it is this Court's duty to place Congress back within its limits of power, not only as to these two statutes at issue here, but multiple criminal statutes, that only have tenuous and superficial jurisdictional hooks, when they are present before the Court.

The Supreme Court even recognized that Wickard v. Filburn, 317 U.S. 111 (1942) is "perhaps the most far reaching example of Commerce Clause authority over intrastate activity". Lopez 514 U.S. at 560. Filburn was penalized for growing more wheat on his property than allowed under the Agricultural Adjustment Act even though he did not intend to distribute the crop. Justice Thomas went so far as to move to remove the "substantial effect" test when analyzing Congress' power under the Commerce Clause because such test was against the original meaning of "commerce" and allowed Congress unconstitutionally limitless power.

The "channels" of interstate commerce category seems to have originated from the Supreme Court's language in the case of Caminetti v. United States, 242 U.S. 470, 491 (1917) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question"), which was adopted and applied in Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964).

A closer examination of these two cases will highlight the context in which the term "channel" is meant to apply in relation to interstate commerce. Caminetti consisted of three male defendants convicted and sentenced for violating the White Slave Traffic (Mann) Act. Caminetti, Diggs, and Hays' sentences were affirmed by circuit courts on appeal, so they came to the Supreme Court by way of writs of certiorari. Caminetti was convicted of transporting and causing to be transported, and aiding and assisting in obtaining transportation for a woman from Sacramento, CA to Reno, Nevada, for the purpose of debauchery, and for an immoral purpose, to wit, that the aforesaid woman become his mistress and concubine. Diggs was convicted of the same crime as Caminetti for a different woman who was transported from Sacramento, CA to Reno, NV. Diggs was convicted for a second charge for the same conduct as to Caminetti's lady companion. Diggs third and fourth convictions resulted from him procuring train tickets for each woman. Hays was convicted of persuading, inducing, enticing, and coercing a female unmarried and under 18 to travel from Oklahoma City, OK to Witchita, Kansas intending that she engage in prostitution, debauchery and other immoral practices. Hays procured a train ticket for the girl and she was transported by such from Oklahoma to Kansas. Count Two was essentially the same charge for the same woman. The mode of transportation being a common carrier, The Atchison, Topeka, & Santa Fe Railway, was deemed a "channel" of interstate commerce, a stark contrast from what is considered a "channel" of interstate commerce today.

The Supreme Court held that the law underlying the three defendants' convictions made it an offense to knowingly transport or cause to be transported, etc., in interstate commerce, any woman or girl for the purpose of prostitution, debauchery, or any other immoral purpose. The Court upheld the statute under Congress' authority granted by the Commerce Clause because, "the title of this act embraces the regulation of interstate commerce 'by prohibiting the transportation therein for immoral purposes of women and girls'". Caminetti, 242 U.S. at 490. The Act's legislative report indicated "that the legislation was needed to put a stop to a villainous interstate and international traffic in women and girls." Id., at 490.

"Congress has no power to punish one who travels in interstate commerce merely because he has the intention of committing an illegal or immoral act at the conclusion of the journey. But this act is not ~~connected~~ concerned with such instances. It seeks to reach and punish the movement in interstate commerce of women and girls with a view to the accomplishment of the unlawful purposes prohibited.

"The ~~transportion~~ transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the 'channels' of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question."

So as can be seen, the term "channel" was applied to means of physical transportation when such means actually transported the

the thing or person being the objective of immoral and injurious purpose in interstate commerce. Even to stretch this category to allow for the use of such physical transportation mode, which is frequently used for interstate commerce, to make only intrastate travel subject to the power of Congress under the Commerce Clause, such a stretch could not justify the excessive reach of the power to encompass the inevitable use of private means of communication today. While the phone and especially the internet can be used to transport digital goods, they are also every capable human being's most basic means of communication and expression, whether to their parent or sibling, neighborhood peer, teacher, boss, classmate, significant other, or religious companion and should not be subject to a limitless control by Congress merely because invisible signals of frequency bounce off towers possibly located outside of the state where the communication originates.

In the Heart of Atlanta Motel, Inc., the owner did not want to follow a portion of the Civil Rights Act which mandated that his motel allow black people to rent rooms there just as surely as white people could. The motel owner brought suit to fight the Act due to it exceeding Congress' power to regulate commerce. 75% of the motel's registered guests were from out of State and the motel accepted convention from outside of Georgia. Due to the motel's clear business in interstate commerce, any discrimination based on race would obstruct and put a hamper on the interstate commerce conducted by

that group of people. Again, lodging for residents of other states is so intertwined with transportation and trade ["commerce"] among the several States Congress had power under the Commerce Clause to regulate such. Moreover, the Motel had over 200 rooms and had a substantial media presence soliciting patronage from Outside the State of Georgia. The act in question also stated "Private clubs are excepted under certain conditions." The Supreme Court further justified the new version of the Civil Rights Act in comparison to that of 1875 stating: "In contrast, the applicability of Title II is carefully limited to enterprises having a direct and substantial relation to the interstate flow of goods and people, except where state action is involved." Id. at 251. Although the case of Lopez seems to deem Heart of Atlanta Motel as a case supporting the "channels" of interstate commerce category, presumably in part because it quotes the "channels of interstate commerce" phrase from Caminetti, Heart of Atlanta, by reading its ~~opinion~~ ruling, was considered by the Supreme Court as being under the "substantial effect" and direct relation category. Regardless, as mentioned previously, these categories are interchangeable and so intertwined Congress can truly "regulate" limitlessly and label it in whichever category to justify what is truly beyond its powers to do.

Ironically, the "instrumentalities" category is attributed to two cases which also involve the regulation of rates for travel and transportation by train when the rates were being enforced in a manner

obstructing and hindering interstate travel and transportation. Houston, East West Texas Railway Co. v. United States, 234 U.S. 342 (1914). The other case, Southern R. Co. v. United States, 222 U.S. 20 (1911) upheld an act maintaining that railcars be maintained in compliance with federal regulation to ensure safe and effective transportation even if such railcars were operating intrastate only. So the "instrumentalities" category finds its basis in "regulations" put in place "to make regular" the operations of corporations. although conducting intrastate business, they were still involved in matters directly and/or substantially related to and/or effective upon interstate commerce in a real way. Looking this deep, Mr. Kuhl finds himself astonished, as Randy Barnett did when writing The Original Meaning of The Commerce Clause, that these categories established to broaden and advance Congress's powers to regulate interstate commerce founded in cases concerning trade and travel commercial in nature have been expanded to the inevitable and mandatory mode of all communication and expression today no matter how private and non-commercial it may be.

In The Employers' Liability Cases, 207 U.S. 463, 497 (1908), the Supreme Court invalidated a statute creating negligence action against common carriers for personal injuries of employees sustained in the course of employment, because the statute "regulates the persons because they engage in interstate commerce and does not alone regulate the business of interstate commerce." "The Constitution divides authority between federal and state governments for the

protection of individuals. State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power'". New York v. United States, supra at 181 505 U.S. (1992) (quoting Coleman v. Thompson, 501 U.S. 722, 759 (1991) (~~Blackmm~~ Blackmun, J., dissenting)). "Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." Lopez, 514 U.S. at 577 (Kennedy, J, and O'Connor, J., concurring). Kennedy and O'Connor continue "the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing a freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far." Id. at 578.

Nowadays the federal government is punishing people for possession of a gun that at any time traveled in interstate commerce regardless if the possessor had anything to with such travel or even knew of it. They are punishing people for conversing with minors privately within their own state if the conversation encourages not prostitution or interstate travel, but statutory rape which may be totally legal in another state. If one buys a camera or phone from the local Best Buy and takes a picture of a naked teenager with no intent to distribute or otherwise share the photo, that person is punished if the phone or camera was produced out of state. If someone grows weed in

their own home or yard can be prosecuted by the federal government even if growing Marijuana in their state is legal and they had no intention to sell the weed. If two neighors call and text each other to facilitate a murder of a man two blocks over and then travel in a car to commit that murder, they can be federally prosecuted. While this conduct is criminal and some far more reprehensible than others, they do not involve interstate commerce, or commerce at all for that matter and are not to be punished by the federal government.

"At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." ~~Lopez~~ Lopez, at 586 (Thomas, J., concurring) See S. Johnson, A Dictionary of the English Language 361 (4th ed. 1773) (defining commerce as "Intercourse; exchange of one thing for another; interchange of any thing; trade; traffick"); N. Bailey, An Universal Etymological English Dictionary (26th ed. 1789) ("trade or traffic"); T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("Exchange of one thing for another; trade, traffick"). This understanding finds support in the etymology of the word, which literally means "with merchandise." See 3 Oxford English Dictionary 552 (2d ed. 1989) (com- "with"; merci-merchandise").

"Put simply, much if not all of Art. 1, §8 (including portions of the Commerce Clause itself), would be surplusage if Congress had been given authority over matters that substantially affect interstate commerce. An interpretation of cl. 3 that makes the rest of §8

superfluous simply cannot be correct. Yet this Court's Commerce Clause jurisprudence has endorsed just such an interpretation: The power we have accorded Congress has swallowed Art. 1, §8." Id. at 589.

"Our construction of the scope of congressional authority has the additional problem of coming close to turning the Tenth Amendmendment on its head. Our case law could be read to reserve to the United States all powers not expressly prohibited by the Constitution." Id. at 589. Looking to Barnett's The Original Meaning of the Commerce Clause, Justice Thomas concurring in Lopez, Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn L. Rev. 432 (1941), Epstein's The Proper Scope of the Commerce Power, 73 Va. L. Rev. 1387 (1987), and Berger's. Judicial Manipulation of the Commerce Clause, 74 Tex. L. Rev. 695 (1996).

For the reasons above, taken into consideration with the disection to follow, this Court should take the courage to right this long wrong and dismiss both Counts in the indictment as being beyond Congress' power. "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so". Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. at 311 (1981) (Rehnquist, J., concurring in judgment); Heart of Atlanta Motel, 379 U.S. at 273 ("Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court") (Black,

J., concurring).

## 1. 18 U.S.C. §2251(a) Facial Challenge

The need to combat child pornography is obvious, however such need has been allowed to improperly be considered by the judicial branch to justify actions which lie outside the sphere of constitutional authority. Such conditions do not create or enlarge constitution power. See Schechter Poultry, at 258. Despite this fundamental principle, the legislative branch has been complicit in such unconstitutional justification by upholding §2251(a) against numerous challenges founded upon the Commerce Clause.

While challenges to §2251(a) have been shot down, such decisions have not gone without skepticism. See U.S. v. Morales-De Jesus, 372 F.3d 6, 13-14 (1st Cir. 2004) ("Congress formulated a broader jurisdictional element that both invokes its Commerce Clause power and purports to exercise that power by reaching any child pornography that was produced using materials that moved in interstate commerce. Although this jurisdictional element ensures that any prosecuted conduct has a minimal nexus with interstate commerce, that minimal nexus may not meet the substantial effect requirement of Morrison. In Rodia, the Third Circuit found it 'at least doubtful... that the jurisdictional element adequately performs the function of guaranteeing that the final product regulated substantially affects interstate commerce.'") (quoting United States v. Rodia, 194 F.3d 465, 473 (3rd Cir. 1999)). The First Circuit went on to hold, "If the

jurisdictional element bore sole responsibility for establishing that the impact of the regulated activity on interstate commerce is substantial or direct, the language of §2251(a) likely would not be up to the task. The jurisdictional element focuses on thing such as film, cameras, videotapes, and recorders moving in interstate commerce, which are then used to produce child pornography. As a matter of logic, this Commerce Clause premise has the kind of flaw so worrisome to the Supreme Court in Lopez and Morrison - it could justify federalizing a vast array of crimes now prosecuted by the states, solely because the criminal used 'materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means.'" Congress does not claim that this production of child porn is obstructing, decreasing, or increasing the demand for phones or film and cameras. Under this logic, a person who hires a prostitute that has traveled in interstate commerce to the location where she is prostituting 5 years earlier, and unknown to the person hiring her, could be ~~prosecuted~~ prosecuted by the federal government. Or if a person used the internet to hire a prostitute inside the same state, that person could be prosecuted under federal law. If a person drove his car or a bike that was manufactured outside of his state to a local area to hire a prostitute, he could be prosecuted under federal law. Suprisingly, the language of §2251(a) in relevant portions states "in or affecting interstate or ~~foreing~~ foreign commerce," not "in or 'directly' affecting" or "in or 'substantially' affecting" such commerce. This alone, if analyzed against the "substantial affects" test incorporated

by the Supreme Court by Lopez, does not comport with Congress's limited powers under the Commerce Clause and any further discussion must cease, and the judicial branch must excercise its duty, obligation and authority to the People and under the Constitution to intervene because Congress has tipped the scales too far. Lopez, 514 U.S. at 578.

Although the judicial branch has found Congress's authority under the Commerce Clause allows laws that restrict production or manufacturing, it deserves a closer look. While production and manufacturing, including the growing of crops, the Supreme Court erroneously upheld a penalty imposed upon a man for growing more wheat on his land than was permitted under the Agricultural Adjustment Act. See Wickard v. Filburn, 317 U.S. 111 (1942). However, this case did not involve an average private citizen planting some seeds in his backyard. Robert Filburn owned several acres of land and operated a farm, maintaining a herd of dairy cattle, selling milk, raising poultry, and selling poultry eggs. He also grew and sold wheat all the while using some of the crop to feed the poultry and livestock utilized for commercial business, making flour for home consumption, and keeping the rest for the following term of seeding. It is obvious Filburn ran a business and was engaged in commerce. Being so, his wheat crop was subject to compliance with the act, however Filburn sowed over 10 acres of wheat than was permitted under the act resulting in a harvest of 239 bushels over the lawful limit and was subject to a penalty of 49¢ per bushel. Filburn refused to pay and the

issue was litigated up to the Supreme Court. Although Filburn claimed the excess wheat was not to be sold or traded, but was only for home consumption, his crop was so intertwined with the commerce of his farm, one could see why the Court decided to allow Congress to limit Filburn's wheat production. However, that logic, right or wrong, cannot be extended so far as touch the completely private production of child pornography by a person who has no involvement in a business of producing films or depictions whether legally or illegally and has no intention to share, sell, or trade the pictures or videos whatsoever. Especially if the videos are of a single individual and produced under a completely personal private relationship. In fact, this is not what Congress punishes in itself, they justify §2251(a) prosecutions in this instance if the camera, phone, or other material used to produce the depiction has ever moved in interstate or foreign commerce. So, hypothetically, a person could manufacture a camera in his own home and then use that camera to produce numerous depictions of child pornography with several victims and not be federally prosecuted so long as he did not transport the pictures, to another state, or using phone or internet service. Regardless, the jurisdictional element based on any materials that "have been mailed, shipped, or transported in interstate or foreign commerce by any means" is in no way affecting interstate or foreign commerce because the commerce for such transport in no way is connected to the production of the visual depiction. No matter how grave the national crisis of child pornography, the analysis of such

stops short of an attempt to justify actions outside of Congress's Constitunionally granted authority.

"The mere presence of a jurisdictional element... does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it per se constitutional." United States v. Bishop, 66 F.3d 569, 585 (3rd Cir. 1995). Chief Justice Marshall, writing for the Supreme Court in Cohens v. Virginia, 6 Wheat 264, 5 L. Ed. 257 (1821), noted that Congress had "no general right to punish murder within any of the States," and that it was "clear that Congress cannot punish felonies generally." §2251(a) is punishing the production of child pornography generally with no true interstate commerce element in relation to the materials portion. "As a practical matter, the limiting jurisdictional factor is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce." Rodia, 194 F. 3d at 473. See United States v. Holston, 343 F.3d 83, 88-89 (2nd Cir. 2003) (finding the jurisdictional "hook" factor ~~of~~ only superficially met and questioning the effectiveness of a jurisdictional element when "the interstate component underpinning the jurisdictional element, for example, the shipment of a video camera, is attenuated from the criminal conduct - the production of child pornography - which occurs entirely locally."); U.S. v. Maxwell, 446 F.3d 1210, 1218 (11th Cir. 2006) (after deeming the jurisdictional element of §2252A (a)(5)(B) that prohibits possession of child porn that has been produced using materials ~~produced~~ that have traveled in interstate commerce as unconstititutional, the Supreme Court remanded in light of Gonzales v. Raich, 545 U.S. 1 (2005). However,

the 11th Circuit held: "Nothing in Raich causes us to question that conclusion, nor to second guess our determination that, where a jurisdictional element is required, a meaningful one, rather than a pretextual incantation evoking the phantasm of commerce must be offered." Due to Raich's erroneous and unconstitutional decision, the Eleventh Circuit was forced to overturn their constitutionally proper ruling. The Sixth and Ninth Circuits have also held the materials transported in interstate commerce jurisdictional element of the child pornography statutes an unconstitutional stretch of Congress's power under the Commerce Clause, but have since backpedaled from those brave and constitutional rulings. See United States v. Corp, 236 F.3d 325 (6th Cir. 2001); United States v. McCoy, 323 F.3d 1114 (9th Cir. 2003). Also, the district Court of Alabama and 11th Circuit upheld a challenge against §2251(a) based on the grounds that Congress had exceeded its powers under the Commerce Clause. See United States v. Matthews, 300 F. Supp. 2d 1220 (N.D. Ala. 2004). That case was remanded by the Supreme Court in light of Raich, U.S. v. Matthews, 546 U.S. 1073 (2005), and the Eleventh Circuit was again forced to reverse its holding.

Raich was decided over 20 years ago and only ~~five~~ one Justice remains in place from that era, and ironically it is the man courageous enough to write the strong common sensical constitutional concurrence in Lopez, Justice Thomas Clarence. It is time for this matter to be presented to the Supreme Court once again. While child exploitation is immoral and a serious problem, so are school shootings which forever

robs children of their life and instills fear and despair across the Nation. Congress's only authorization according to the courts for making these pretextual incantations evoking a phantasm of any commerce let alone interstate commerce, is to curb the reprehensible child exploitation today. However such crisis does not create or expand Congress's power beyond what it was granted by the Constitution.

Furthermore, every state defines and punishes severe crimes for child pornography. Thus, if a person is not engaging in actual interstate commerce, that person should not be punishable by the federal government whether it be for manufacturing or growing drugs for personal use, producing a photo or video of child porn with no intent to distribute such, simply possessing a gun that at some unknown and irrelevant time traveled in interstate commerce, or any other non-commercial intrastate crime. "We... reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." United States v. Morrison, 529 U.S. 598, 617-18 (2000); Bond v. United States, 572 U.S. 844, 858 (2014) ("Perhaps the clearest example of traditional state authority is the punishment of local criminal activity.")

In Jones v. United States, 529 U.S. 848 (2000), the Supreme Court confronted the question whether the federal arson statute, which prohibited burning "any... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce," reached an owner-occupied private residence. Once again, the Court rejected

the "expansive interpretation," under which "hardly a building in the land would fall outside the federal statute's domain."

In Wabash, St. Roy Co v. State of Illinois, 118 U.S. 557 (1886), the Supreme Court held that an Illinois statute regulating rates of train travel would be valid if it "could be construed to apply exclusively to contracts for a carriage which begins and ends within the state, disconnected from a continuous transportation through or into other states." Thus, the intrastate production of child pornography with no intent to be shared, sold, or traded, should not be punishable under federal law. It is even recognized by Congress that they removed the "pecuniary gain" language from §2251(a) because many child pornographers traded or gave their child porn away for free and the "pecuniary gain" language constricted their ability to prosecute distributors of child porn. Now the statute's reach has been broadened to an unconstitutional spectrum punishing production that has no relation to commerce at all.

Accordingly, Mr. Kuhl respectfully requests this Court to protect him from the arbitrary and unconstitutional abuse of power by Congress through enacting §2251(a), and dismiss Count One of the indictment.

## 2. §2251(a) As Applied Challenge

This case is not the usual child exploitation case. Mr. Kuhl's actions while reprehensible are not consistent with a child predator because he is not that. Originally Mr. Kuhl became involved with a female who continuously

claimed she was 17 years old. Defendant has spent approximately 11 of the past 19 years incarcerated off and on and has the social and emotional mindstate of a teenager at times. In no way is Mr. Kuhl trying to minimize or justify his wrongs, especially in this matter, but only trying to give a glimpse to the Court inside his life and mind. Mr. Kuhl does not like to open up about the abuse and neglect he suffered as a child sexually, physically, emotionally, and mentally but everyone has their demons and Defendant is far from different.

Once a person who has felt used, unwanted, and unworthy for so long and trapped in their own insecurities finally feels adequate wanted and strong, they try to hold on to that. In a sense this is how Mr. Kuhl felt in this instance. After learning of this girl's age Kuhl did make some effort to distance himself but easily willing to fall back into this toxic and immoral relationship at the slightest reiniation of contact made by the female. However, Mr. Kuhl did not force or overcome the girl's will. While rude and disrespectful at times, sadly this is all Kuhl has seen throughout the relationships of people around him since a child. Some of these characteristics, Mr. Kuhl is truly ashamed to admit, have made their way into his character, but he realizes this and tries to cope with and change it.

In the matter hand, law enforcement has been involved with Mr. Kuhl throughout his life many times, but never for sexually preying on minors. Never did Mr. Kuhl show any depictions located on his phones to anyone, nor did he ever seek out child pornography or look to sell or

trade any visual depictions of this young lady. Mr. Kuhl does not even remember the pictures or videos the government is basing this charge on. Neither does Mr. Kuhl remember asking for or suggesting that the girl send him any pictures and from the portion of discovery provided thus far, the transcripts of texts no way suggest otherwise.

Multiple phones and computers were seized from Mr. Kuhl or locations associated with him, yet not a sliver of a suggestion of child pornography was found other than these depictions involving this one female the evidence shows Mr. Kuhl was in a relationship with. No way was Mr. Kuhl's conduct involved directly with or substantially effective on interstate commerce.

Although it seems the Sixth Circuit case has been discarded that did a circumstantial analysis of a child pornography case its logic should still control. (United States v. Corp (2001)). See Truesdell v. Friedlander, 80 F. 4th 762, 765 (6th Cir. 2023) ("Besides, the Court has told us that we must follow a directly controlling case even if later decisions call it into doubt.") Moreover, "[a] panel of [the 6th Circuit Court] cannot overrule the decision of another panel." Salmi v. Sec'y of Health & Human Services, 774 F. 2d 685, 689 (6th Cir. 1985).

Accordingly, the questions outlined in Corp for a case-by-case basis should be applied in the instant case. However first we should look at the facts of the Corp case. Corp was a 23-year-old male residing in Big Rapids, MI. He dropped off film to be developed at a local pharmacy stating "these are sick." Employees contacted police after seeing the

photographs were pornographic shots of young females. It is not clear by the decision how many girls were involved, but two were identified as students at the local highschool. One was 17 and the other was younger. Corp had begun dating Saundra, the 17-year-old, when she was about 17. Corp was also married to a 26-year-old woman named Heather with whom he had a young child. The photographs showed Heather engaging in sexual activity with Saundra.

No evidence was shown that Corp distributed the photos or invited others to view them. The photos were taken approximately 6 months before Saundra turned 18. Corp was charged with violating 18 U.S.C. §2251(a) for production (3 counts), and §2252(a)(4)(B) for possession, of child pornography. Federal jurisdiction was based on the photographic paper being manufactured in Germany. After Corp's motion to the dismiss the indictment because the paper being made outside of Michigan was an insufficient nexus with interstate commerce in light of U.S. v. Lopez, 514 U.S. (1995) was dismissed he pled guilty to possession and the 3 production charges were dismissed.

The Sixth Circuit established 5 questions to make a case-by case determination of whether the relevant activity had a substantial effect on commerce. 1) Was the activity in this case related to explicit and graphic pictures of children engaged in sexual activity, particularly children about 14 years of age or under, for commercial or exploitive purposes? Were there multiple children so pictured? Were the children otherwise sexually abused? Was there a record that defendant repeatedly engaged

in such conduct or other sexually abusive conduct with children? Did defendant move from place to place, or state to state, and repeatedly engage in production of such pictures of children?

Mr. Kuhl is not a pedophile, nor is the government alleging or able to provide proof showing otherwise, and he was not illegally sexually involved allegedly with any other minors other than the 15 year-old girl who he originally believed was 17. Clearly Mr. Kuhl did not have pictures of other minors and is not the typical offender feared by Congress that would become addicted to child porn and perpetuate the industry via interstate connections. These answers are consistent with the way the Sixth Circuit answered them except here the circumstances of Mr. Kuhl's case are applied. Mr. Kuhl's conduct is not commercial activity within the meaning of U.S. v. Morrison, 120 S. Ct. 1740 (2000), although the Sixth Circuit declined to consider this factor after reaching the same approximate conclusions of the questions above in the Corp case.

For these reasons, Mr. Kuhl's conduct and the circumstances of this case do not substantially affect interstate commerce and Count One must be dismissed.

3. §2422(b) Facial

§2422(b) is in Chapter 117 of United States Code Title 18. Chapter 117 is titled "Transportation For Illegal Sexual Activity and

Related Crimes" and originates from the White Slave Traffic (Mann) Act, the act which the Supreme Court case of Caminetti was based upon. The act made it a crime to transport women and girls in interstate commerce for the purpose of prostitution, debauchery, or other immoral purpose. All three defendants were ~~convicting~~ convicted for actually transporting or causing to be transported women or girls from one state to another by train, for the purpose of prostitution, etc. Thus, a conviction required 1) the transportation of women or girls across state lines; and 2) the purpose of such transportation be prostitution, debauchery, or any other immoral purpose, to be proven. Moreover, the transportation must be using a "channel" of interstate commerce, which term the Supreme Court applied to commercial railway companies that were consistently transporting goods and people among the several states. Just as in the case of Wabash St. Roy Co v. Illinois, had the travel been entirely intrastate the conduct would not have been subject to the Mann Act.

In Caminetti, the Supreme Court described the Mann Act saying, "[i]t is specifically made an offense to knowingly transport or cause to be transported, etc., in interstate commerce, any woman or girl for the purpose of prostitution or debauchery, or 'any other immoral purpose,' or with the intent and purpose to induce any such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral purpose." Id., at 485. It is clear it was not enough to only transport the female in interstate commerce but that transportation must be for the purpose of prostitution, etc. Simply communicating with the female to

achieve a mind state of assent to such travel and for such purpose without any intent for the actual travel and underlying purpose to take place, was not a crime. Such an interpretation would lead to absurd and unconstitutional results. Moreover, the "channels" of interstate commerce was never meant to cover private non-common carrier transportation, and even more critical, "channel of interstate commerce" was never meant to apply to private conversation between two individuals within the same state or even in two different states for that matter.

However, §2422(b) has strayed far from the spectrum of what conduct can be criminalized by congress and what a "channel of interstate commerce" is. Intent for prostitution or criminal sexual activity to occur is not required to be charged and convicted of violating §2422(b). Instead, it is literally a thought crime, it punishes people for private communications aimed at achieving a mind state to assent to criminal sexual activity regardless if the communicator ever actually intended for the minor to engage in sexual activity or prostitution! Private communication is no way interstate commerce nor substantially affects such, especially when entirely intrastate. Moreover, achieving a mind state in a minor for reprehensible immoral illegal sexual activity, without intending for any such activity to actually occur is not a crime, and definitely not a crime of interstate commerce under the authority of Congress and the federal government.

Furthermore, although the internet transports digital data world-wide, its use for private communications of a non-commercial purpose

does not render it a "channel" of interstate commerce. There is no trade, selling, buying or bartering; there is no transportation of people or merchandise. When the Supreme Court used the term "channel" of interstate commerce, it did so in the context of a common carrier physically transporting people or things (really people) from one state to another. Not simply using some common carrier, that could travel from one state to another but, only for intrastate travel. Phone service is very similar and essential to every capable human being's daily activities and conversation. Using a phone to call or text someone privately for no commercial purpose is not what the Supreme Court ever intended the phrase "channel of interstate commerce" to apply.

When the Mann Act was enacted it was immoral to engage in adultery or even sex without marriage across the entire U.S. Thus, having a concubine, or mistress, was an immoral purpose that to transport a woman from one state to another for was illegal. This was the same throughought every state across the U.S. and obviously prostitution was not only illegal but commerce. No state criminalizes consensual sex between two adults who aren't married. Moreover, each state has set its own standard as to what age a person can legally consent to sex, and criminal statutes that punish those who have sex with minors under the age of consent, whether by force or not. This is called statutory rape, because by statute, the minor is not of age to legally consent in that state.

Statutory rape "is a paradigmatic common-law state crime," and the current interpretation and application of §2422(b) is "significantly

chang[ing] the federal-state balance, making virtually every [~~crime~~ statutory rape] in the country a federal offense." Bond v. U.S., 134 S.Ct. 2077, 2089-2090 (2014) (quoting and citing Jones v. U.S., 529 U.S. 848 (2000) and U.S. v. Bass, 404 U.S. 336 (1971)). It also is clear that every state criminalizes the use of computers to facilitate sex crimes with minors. §2422(b) is making virtually every sex crime against a minor in the country a federal offense because the use of the internet or telephone is inevitable today, ~~and only~~ except for crimes committed against children so young they have no ability to use a phone and are the most vulnerable. Thus, the most egregious and disgusting sex crimes do not fall under §2422(b)'s broad scope, but instead the more common-law state crime of statutory rape ~~are~~ is being prosecuted by the federal government. To be even more precise, it is not actually the crime of statutory rape being punished, it is the communication used to achieve a mind state of assent to engage in conduct that would be statutory rape even if the communicator never truly intended for the conduct to actually occur. If this is not absurd, arbitrary, and unconstitutional, what is?

Unlike prostitution and even child pornography, private sex crimes between two individuals is in no way a market or commerce, let alone interstate commerce. While the protection of our youth is of the utmost ~~important~~ importance and the sexual abuse occurs nationwide, such an issue does not expand or create power outside of the Constitution for Congress to punish crimes. Additionally, according to BOP.gov (Bureau of Prisons website last visited March 14, 2025) the total federal prison population

consists of 13.5% of sex offenders. Also, statistics show that the recidivism rate amongst sex offenders is the least of all crimes. Clearly, the 13.5% is not due to lack of prosecutions or short prison sentences. While child sexual abuse is unequivocally deplorable, much of this issue, sadly, the federal government is complicit in. Over 300,000 children that came into this country are unaccounted for so they say. Truly, as you know Mr. Kuhl knows, a majority of these children are being sacrificed, expirimented on for mind manipulation technology, and sold and traded amongst the CPS and Elites as sex and work slaves. Ironically, the Mann Act was passed to fight of the importing of alien ~~woman~~ women and girls for prostitution and other sexual motives. But §2422(b) does not punish transportation for the purpose of such sex crimes, nor does it punish enticing for the purpose of such sex crimes, it punishes communication, any and all, that's purpose is to achieve a mindstate of assent of anyone under 18 for such sex crimes that don't have to be nationally standardized under federal law or constitute a certain type of sex crime or even be classified as a felony, so long as it's a crime whereever the communications took place under state law. Using the phone or internet to achieve a mind state of assent in an individual, even a minor, does not affect or involve interstate commerce and Congress does not have the authority to criminally punish such.

For these reasons, the overwhelmingly broad scope of §2422(b) is outside of Congress's authority under the Commerce Clause and the Necessary and Proper Clause. This requires, and Mr. Kuhl prays, the Court to dismiss Count Two of the pending indictment and send Congress

back to the drawing board. Sex crimes against children must be punished, and those crimes that directly involve interstate commerce can be subject to federal prosecution and should. However, §2422(b) goes far beyond that and therefore goes far beyond Congress's power ~~under~~ granted by the Constitution and principles of federalism and comity. "Neither government may destroy the other nor curtail in any substantial manner the exercise of its powers." Metcalf & Eddy v. Mitchell, 269 U.S. 514, 523 (1926). The state crimes are competently and ably prosecuted within their state and should be left to be handled in that matter.

4. §2422(b) As Applied

As previously mentioned, the relationship between Mr. Kuhl and the minor that this indictment is based upon began with Mr. Kuhl under the assumption the girl was 17 and everything they did was legal. If Mr. Kuhl is accused of enticing or persuading the minor, which he is, that conduct occurred when Mr. Kuhl believed, due to the girl's several assertions, she was 17 and thus not a crime. Any persuasion or enticement occurred before Mr. Kuhl knew the girl was 15; once their relationship was ongoing for multiple months Mr. Kuhl no longer persuaded or enticed the girl, (if he did at all) because there was no need to do so as they were both willing participants.

It is not a crime under §2422(b) to have a sexually explicit conversation with a minor, or even to suggest or ask for sex. §2422(b) criminalizes overcoming the will of a minor using what the government claims is a means or facility of interstate commerce. The statute

does not even use the phrase "channels of interstate commerce." Moreover, Mr. Kuhl's communications were private and in no way related to commerce, let alone interstate commerce.

At the age of 15, the girl was within months of being able to legally consent to sexual relations with Mr. Kuhl under Michigan Law. Once Mr. Kuhl became aware of the girl's age he eventually did try to distance himself, but in all honesty did not firmly do so. Multiple times after communications with the minor, Mr. Kuhl was contacted by her and wrongly made the mistake of getting back into an immoral and illegal relationship. The actions of Mr. Kuhl are inexcusable, but he is not one specifically seeking out minors on the internet for sexual relations like most people prosecuted under §2422(b). Shortly after being told the girl was 17, Mr. Kuhl asked for pictures because he wanted to make sure she was not "shaped like no little girl."

Mr. Kuhl's crime is a state crime and has no substantial affect on interstate commerce. He was already being prosecuted in the State of Michigan for the same conduct underlying this federal indictment. The Court should dismiss Count Two and let the State handle crimes within its borders. Defendant did not attempt to prostitute this girl and constantly told her to focus on ~~schol~~ school and even though when Defendant thought the female was 17 he suggested smoking weed, once he found out her true age he did not provide marijuana and constantly told her she shouldn't smoke. Mr. Kuhl's conduct in choosing to continue in this relationship was wrong and criminal, but it was not a

federal matter involving or affecting interstate commerce or any commerce at all.

Article 4, § 1 states that Full faith and Credit shall be given in each State to the public acts, records, and judicial proceedings of every other State. The Federal government's deliberate interruption of the ongoing State proceeding against Mr. Kuhl is in violation of Art. 4, § 1. Thus, this matter should be dismissed and full faith and credit be given to Michigan's judicial proceedings.

## III. SUMMARY AND CONCLUSION

The Framers explicitly gave Congress power to define and punish felonies only in specific contexts (treason, high seas, counterfeiting). The Commerce Clause's omission of "define and punish" suggests a narrower intent - Congress may regulate (make regular) but not create new felony offenses. Criminal law has traditionally been a state power, and allowing Congress to broadly criminalize conduct under the Commerce Clause undermines the federal-state balance.

The absence of explicit "define and punish" language in Art. 1, § 8, Clause 3 contrasts with Clauses 6 and 10 as well as Article 3 § 3 Clause 2, demonstrating that Congress was never granted such power. The indictment, therefore, exceeds Congress's enumerated authority and violates principles of federalism and constitutional structure.

A fundamental rule of constitutional interpretation is expressio

unius est exclusio alterius - the expression of one thing excludes others. The Constitution expressly grants Congress power to define and punish felonies in Clause 10 and Clause 6 (high seas and counterfeiting), as well as Art. 3 §3 Clause (treason). The absence of a similar grant in the Commerce Clause means that Congress was not intended to have such power under that Clause. Commerce Clause authority was to ensure fair trade among the states, thus, any federal statute criminalizing conduct solely based on the Commerce Clause is unconstitutional.

Under the Tenth Amendment, powers not delegated to Congress are reserved to the states. Criminal law has been within the exclusive jurisdiction of the states, except where the Constitution explicitly grants Congress criminal lawmaking power. The Supreme Court has recognized that Congress's regulatory authority under the Commerce Clause does not extend to purely intrastate, non-commercial activities.

Even if Congress could criminalize conduct under the Commerce Clause, courts require a substantial connection between the offense and interstate commerce. Mere use of the internet, a phone, or travel across state lines is not sufficient under Lopez. Court require substantial and non-attenuated connections to interstate commerce.

Here the indictment does not establish a substantial commerce nexus, and therefore fails under controlling federal precedent.

If Congress could criminalize any conduct with even a minor connection to commerce, there would be no meaningful limits on federal power. The Supreme Court has repeatedly warned against allowing

the Commerce Clause to become a general police power. (Morrison, Lopez). State governments are fully capable of prosecuting felony conduct. within their jurisdictions. Congress's attempt to federalize private conversations and statutory rape and personal private photos with no commercial aspect oversteps constitutional limits and undermines federalism principles.

Fore the foregoing reasons, Defendant respectfully requests this Court to dismiss the indictment, as it exceeds Congress's constitutional authority under Art. 1, §8, Clause 3. The statutes facially and as applied lack a valid jurisdictional nexus, violate federalism principles, and contradicts Supreme Court precedent limiting the Commerce Clause's reach.

Respectfully Submitted,

S. Kuhl March 19, 2025

S. Kuhl 61189510
1035 James
P.O. Box 845
White Cloud, MI 49349

Samuel Alexander Kuhl, Reg. #61189-510
Newaygo County Jail
P.O. Box 845
White Cloud, MI 49349




Clerk of the Court
U.S. Dist. Court
110 Michigan NW
Grand Rapids, MI 49503

LEGAL MAIL