UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

FILED - GR
April 4, 2025 12:21 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: KB SCANNED BY: JW / 4-4

UNITED STATES OF AMERICA,
Plaintiff,

v.

SAMUEL ALEXANDER KUHL,
Defendant.

Case no. 1:23-cr-44
Hon. Jane M. Beckering
Oral Argument Requested

# MOTION TO DISMISS COUNT ONE

Defendant Samuel Kuhl proceeding pro se, respectfully moves this Court to dismiss Count One of the pending indictment based on 18 U.S.C §2251(a) specifically for vagueness and overbreadth based on the term "use". Mr. Kuhl will then press a vagueness and then substantial overbreadth challenge as the definition of "lascivious exhibition" is not provided and thus, proscribes expressive media from the population. The same challenge will be brought as the definition of sexually explicit conduct utilizes the word "simulated" to proscribe expressive media from the population.

These arguments should not be read as some justification for the harm caused to children through the creation, dissemination, and possession of visual media that harmed children through its creation. That should definitely be prohibited. Indeed, our Bill of Rights does not predicate one individual's right to speak by reducing the autonomy of another. Abuses of the right of the freedom of speech is unacceptable, and there is no argument that the Framers ever intended to allow persons

to be harmed to allow others to speak freely.

However, to simulate harm should not be proscribable, nor should the freedom to publicly share the norms of one's cultural festivities. Indeed, as will be discussed, there are numerous examples already in circulation, of visual artistic works that simulate the various abuses of children, and several instances of dancing being publicly displayed that are sexually provocative and teenagers constantly engage in with their buttocks/genital area being the focal point of these public displays. These artistic works and sharing of musical festivities fall under the purview of the proscription on visual depictions of "sexually explicit conduct."

Obviously, if a law does not comply with the Constitution's various guarantees, there is no way a Court could have jurisdiction to hear the case. Indeed, the law was never passed, as Congress lacks the power to just rid the nation of constitutional protections without a proper convention.

# I. FIFTH AMENDMENT

## a. Legal Standard for Vagueness Claims

"The void-for-vagueness doctrine derives from the Due Process Clause of the Fifth Amendment, which guarantees that 'no person shall... be deprived of life, liberty, or property, without due process of law.'" Golicov v. Lynch, 837 F.3d 1065, 1069 (10th Cir. 2016) (quoting

Johnson v. United States, 135 S. Ct. 2551 (2015). Supreme Court precedent "establish[es] that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary ~~entice~~ enforcement." Johnson, 135 S. Ct. at 2556.

When addressing a facial vagueness challenge, the Court "must begin with the presumption that the statute comports with the requirements of ~~due process~~ federal due process and must be upheld unless satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." (United States v. Hunter, 663 F. 3d 1136, 1141 (10th Cir. 2011)). In Johnson, the Supreme Court struck down the so-called "residual clause" of the Armed Career Criminal Act for vaguness. There, the Court reiterated that "[t]he prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process." 135 S. Ct. at 2557.

b. The Statute

Mr. Kuhl is challenging the entirety of Chapter 110 of Title 18 of the United States Code. The definition of "sexually explicit conduct" is void for vagueness. All proscriptions that Congress has enacted are

affected by the definition of "sexually explicit conduct" and the issue is not severable.

For the purpose of the Act and this challenge, "sexually explicit conduct" is defined as:

(2)(A) Except as provided in subparagraph (B), "sexually explicit conduct" means actual or SIMULATED

(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(ii) bestiality;

(iii) masturbation;

(iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the genitals or pubic area of any person;

(B) For the purposes of subsection 8(B) of this section, "sexually explicit conduct means-

(i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;

(ii) graphic or SIMULATED

(I) bestiality;

(II) masturbation; or

(III) sadistic or masochistic abuse; or

(iii) graphic or SIMULATED lascivious exhibition of the genitals or pubic are of any person.

C. The Definition is Vague

Congress, by utilizing the word "simulated", has created a law that causes people of ordinary ~~intellige~~ intelligence to not know what is prohibited. Does Congress truly believe that "simulated" is a definite word that people of ordinary intelligence would be able to determine the conduct prohibited? Apparently, they do.

What are people not to do? Are they ever allowed to create a visual depiction of the abuse they suffered in their own lives? Are they never allowed to create a movie showing their own coming of age and discovery of sexual identity?

Any reasonable individual would be worried and refrain from taking a Pulitzer prize winning book and converting it to a movie such as Angela's Ashes by Frank McCourt. Is there any wonder why this has never been adapted into a movie? Obviously, the movie production would have to "simulate" the sadistic abuses and sexual discovery of the boy in the true story. There was nothing that is morally repugnant by Mr. McCourt's recounting of his childhood. Would simulating these scenes violate the definition of sexually explicit conduct? One would certainly hope that a movie company wouldn't actually abuse children (or anyone for that matter) to make their point. The issue here has nothing to do with the definition for

the actual abuses the statute proscribes. It's the simulated abuses.

## II. First Amendment

### a. Legal Standards for Overbreadth Claims

A criminal defendant is permitted to challenge, under the First Amendment, a statute as overbroad, and thus enforceable too, even where their conduct may be legitamitely proscribed. New York v. Ferber, 458 U.S. 747, 769 (1982). The Supreme Court has established, that for a challenger to prevail on a First Amendment facial challenge, they must show that there is "substantial overbreadth." Id., at 769-70.

The practical application of this is that Mr. Kuhl must show that there is a "realistic danger that the statute... will significantly compromise recognized First Amendment protections." Members of City Council v. Taxpayers of Vincent, 466 U.S. 789, 801 (1984). To do this, Mr. Kuhl "must identify protected materials that would be inevitably targeted by the [Challenged] statute." United States v. Brune, 767 F.3d 1009, 1020 (10th Cir. 2014). The touchstone to a facial attack on First Amendment grounds is that the overbreadth must have substantial real-world applications and not mere "fanciful hypotheticals." U.S. v. Stevens, 176 L. Ed. 2d 435, 454 (2010).

Child pornography has been long held to not be protected by the First Amendment. However, "[t]he broad authority to proscribe child pornography is not unlimited." United States v. Williams, 553 U.S. 285, 289, 128 S. Ct.

1830 (2008). The Supreme Court made very clear that the crime to be prohibited is not in the cravings, thoughts, or desires of the pornographers, but of the harm to actual children. Ashcroft v. Free Speech Coalition, 535 U.S. 234, 240 (2002). Indeed, every holding to ~~punish~~ publish from the Court has stressed that the prohibition on child pornography has to do with the protection of the health, well-being, and maturation of actual children. ~~Ashcroft~~ Ferber, supra; Osborne v. Ohio, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims' continuing harm by haunting the children in years to come.")

The Child pornography prevention Act ("CPPA") has suffered several attacks for overbreadth. Most recently, the Court invalidated two provisions of the Act as overbroad as they proscribed the creation and dissemination of images involving ficticious minors – as opposed to real minors. Thus, the Circuits have extended this reasoning to criminal cases as a requirement that the government prove, beyond a reasonable doubt, that a real child was used in the production of the depiction at issue. U.S. v. Sims, 428 F.3d 945, 956 (10th Cir. 2005).

We must remember that Congress's authority to proscribe child pornography does not "consist in the cravings of the ~~individual~~ person posing the child or in the cravings of his audience." U.S. v. Hernandez, 183 F. Supp. 2d 468, 471 (D.P.R. 2002). The crime that Congress is permitted to proscribe, under the First Amendment, is "the offense against the child – the harm to the physiological, emotional, and mental health of the child." (quoting Ferber, supra). Be that as it may, "we must bear in mind that at

the bottom of every child pornography case, lie the conflicting interests of free expression and a child's own particular autonomy and dignity." (Id.)

b. The CPPA is Facially Overbroad

The CPPA is codified at 18 U.S.C. §2251, et seq. and holds statury definitions at 18 U.S.C. §2256. Notably, the CPPA prohibits the creation and/or dissemination of visual depictions that portray actual children engaged in "sexually explicit conduct." However, "sexually explicit conduct" is not defined as we would naturally think. Indeed, the definition for "sexually explicit conduct" in the CPPA is different than that of "sexual act," as is defined for the sexual abuse statutes (18 U.S.C. §2246) (note that "sexual act" and "sexual contact" does not prohibit simulations of the same). In Free Speech Coalition, the Supreme Court found and held that "the Government can prohibit non-obscene child pornography only to achieve "the State's interest in protecting the children exploited in the production process." Id. at 240, 250. (citing New York v. Ferber, 458 U.S. at 758). Accordingly, the Supreme Court made clear that Congress cannot proscribe depictions that "appear" to use minors. The production of the depictions must use real minors in their production to violate the CPPA.

Here, Mr. Kuhl is attacking use of the word "simulated" in the CPPA's definition of "sexually explicit conduct." Just like the issue in Free Speech Coalition, use of the word "simulated" extends the act to visual depictions that do not harm children during the production process

and certainly do not "haunt children in the years to come." Mr. Kuhl presents that real children can, and are, used to produce visual media that simulates "sexually explicit conduct" - as defined in the CPPA - to create artistic and socially acceptable works of art that are protected by the First Amendment. Thus, the CPPA is facially overbroad and unconstitutional.

(i) Step One

Naturally, "the first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." Williams, supra, 553 U.S. at 293.

In the world of statutory construction, when Congress leaves a term undefined in an act, the Court is to give the questioned term its "plain and ordinary meaning;" and "courts may rely on dictionary definitions." Hatcher v. Nationwide Property & Casualty Ins. Co., 14-2068 (6th Cir. May 6, 2015) (quoting Guardian Envtl. Servs., Inc. v. Bureau of Constr. Codes & Fire Safety, Dept. of Labor and Econ. Growth, 755 N.W. 2d 556, 560 (Mich. Ct. App. 2008)); see also Whitman v. Foremost Ins. Co., 15-4303 (6th Cir. July 27, 2016) ("a court must lend undefined terms their plain and ordinary meaning."); United States v. Small, 988 F.3d 241, 254 (6th Cir. 2021) ("When a statutory term is undefined, such as the questioned terms in the case at hand, courts must give it the 'ordinary meaning.' (United States v. Santos, 553 U.S. 507, 511 (2008)) To ascertain ordinary meaning,

courts often turn to dictionary definitions for guidance.").

According to Webster's II New Riverside University Dictionary (Houghton Mifflin Co., 1994), "simulate" is defined as: sim-u-late [] vb -lat·ed, -lat·ing, -lates 1. To have or take on the appearance, form, or sound of: IMITATE. 2. To make a pretense of: FEIGN <simulate an interest in a conversation> -adj. [] Simulated. See Webster's II New Riverside Univ. Dictionary at 1086.

The Webster's Dictionary New Edition defines "simulate" as: sim·u·late [] vb -lat·ed; -lat·ing: to give or create the effect or appearance of: IMITATE; also: to make a simulation of. See Id. at 671. Thus, "simulate" means, in layman terms, to appear to be the real thing. (Free Speech Coalition holding "appears to be" to be overbroad in context of minority status of actors.)

A citizen (and sometimes a foreign national) commits crimes involving child pornography if an image merely uses a real minor child appearing to have sexual intercourse, bestiality, masturbation, or lascivious exhibition. Thus, a real child does not need to actually perform these acts. The child need only simulate the acts and, thus, not be abused. Indeed, a child could could conceivably video record or photograph himself ~~masturbating~~ simulating masturbation as a joke. Indeed, with the current state of technology, we know this is actually happening all over the country. The Supreme Court recognized that sometimes children do engage in "sexually explicit conduct" at their own volition. Free Speech Coalition, 535 U.S. at 247 ("It is of course, undeniable that some youths engage in sexual

activity before the legal age, either on their own inclination or because they are victims of sexual abuse."))

We know that the CPPA has no exception for serious artistic or literary works. See Camfield v. City of Oklahoma City, 248 F.3d 1214, 1222 (10th Cir. 2001) (affirming District Court's judgment that State of Oklahoma has an exception for bona fide works of art that do not appeal to prurient interests and thus "The Tin Drum" was not considered child pornography under Oklahoma law). A simple reading of the CPPA makes it very clear, regardless of the overall theme of a visual depiction, if it has a real minor depicted in "actual or simulated" sexual conduct then the entire depiction is proscribed under the Act. Brune, 767 F.3d at 1026 n.7.

The Act also does not require the presence of any nudity. See United States v. Helton, 302 Fed. Appx. 842, 846, 847 (10th Cir. 2008) ("The statute does not specify the genitals or pubic area must be fully or partially uncovered in order to constitute an exhibition...") Indeed, Courts have explicitly held that nudity is not necessary to show lascivious exhibition of the genitals. United States v. Kearn, 2015 U.S. Dist. LEXIS 82488 citing United States v. Knox, 32 F. 3d 733, 745-46 (3rd Cir. 1994); Helton, 302 Fed. Appx. agreeing with Knox.

Additionally, the CPPA prohibits real children engaged in simulating themselves, or at the behest of anyone else, in simulated conduct that isn't necessarily sexual in nature. Indeed, the Act prohibits the simulation of "sadistic or masochistic abuse." The ordinary, contemporary meaning of "sadistic" is: sa·dism [] n. [After Comte Donation de Sade (1740-1814)]

1. Delight in cruelty. 2. Extreme cruelty. -sa'dist n. -sa·dis'tic adj. -sa·dis'ti·cal·ly adv. (Webster's II New Riverside Univ. Dictionary at 1030)

Webster's New Edition Dictionary definition of "sadistic" is : sa·dism [ ] n : a sexual perversion in which gratification is obtained by inflicting physical or mental pain on others — sa·dist [ ] n — sa-dis·tic [ ] adj — sa·dis·ti·cal-ly [ ] adv (page 638).

The ordinary, contemporary meaning of masochistic is: mas·o·chism [ ] n. [After Leopold von Sacher-Masoch (1836-1895), Australian novelist] 1a. Deprivation of pleasure from being offended, dominated, or mistreated. b. The tendency to such mistreatment. 2. Direction of destructive tendency inward or upon oneself. -mas'o·chist n -mas'o·chis'tic adj -mas'o·chis'tical·ly adv. (Webster's II New Riverside University Dictionary at 730). Thus, there does not need to be the presence of any actual sexual conduct as one would expect in a pornography statute.

It should be noted that Bouvier Law Dictionary (2012 Edition) defines "simulate" as: SIMULATION (SIMULATE) - An invented depiction of an event as if it were real. A simulation creates the appearance of the place, people and events simulated. Simulations are used to ~~create~~ recreates accidents and other events for the purpose of assessing theories that would explain cause and effect in the original events.

(ii) Real-world Applications

Mr. Kuhl will describe a number of artistic works that fall victim to

the CPPA's overbroad definition. For each work, Mr. Kuhl will provide a brief synopsis and helpful statistics. He will also provide an explanation of how the First Amendment protected work violates the CPPA and the grasp the CPPA could have over its producers, distributors, receivers, and possessors.

The Kite Runner ~~Synopsis~~ Synopsis

The Kite Runner is a film adaption of the book of the same title by Khaled Housseni. The story captivates the audience as the struggles of a young ~~Amair~~ Amir whose only friend is the servant boy at his Afghanistan home named Hassan. The story profiles Amir's struggles to fit in and be accepted by his father.

The young Amir is a blessed kite flyer. His best friend Hassan is the most spectacular kite runner. In Afghanistan and Pakistan, kite flying involves a battle of kites. Each kite must the other, and the last one standing wins. The trophy is to run down the kite.

Amir has won and Hassan - the ever loyal best friend - promises to run and catch the kite as Amir's trophy to display. Hassan is able to locate the kite and catches it. However, he is in an alleyway at the bazaar and becomes trapped by his and Amir's nemesis Assef and Assef's gang. Because Hassan is a lesser individual in Assef's eyes, and Hassan had previously embarrassed Assef, Hassan had to be taught a "lesson" in manners. Assef gives Hassan a choice, give over the kite trophy or suffer

far worse consequences.

The scene unfolds as Hassan informs Assef that he will not give up the kite under any circumstance. At that time, Amir finds Hassan and sees Assef and his gang are surrounding Hassan. Amair, a scared 12-year-old boy, decides to hide and watch. Assef proceeds to rape Hassan because he would not turn over the kite trophy. Amir watches the entire scene.

The scene is quite graphic. There is no doubt that it appears Assef is raping Hassan. The camera shows the actors engaged in simulated anal sex.

This scene could hardly be said to appeal to any prurient interest as it was the pivotal point of the movie. Amir is absolutely ashamed of himself and does not know how to handle that shame of not stepping in and stopping the rape. He decides the best thing to do is to cease being Hassan's friend. Then Afghanistan suffers the Russian occupation and the story turns to Amir's travels - with his father - to the United States. Amir discovers that his father had kept a fairly big secret that involved Hassan. This secret drives Amir to run back to Afghanistan to save Hassan's son from the fate of millions in Afghanistan - death and abuse by the Taliban.

This movie has a scene that shows the sadistic sexual abuse of a prepubescent boy on the streets of Afghanistan and is thus a real-world example of a movie that violates the CPPA.

## The Kite Runner - Statistics

The Kite Runner was directed by Marc Foster and publicly released on January 11, 2008. Amir was played by a youth actor named Zekeria Ebrahimi and was born in 1996. Thus Amir was 12 years old at the time the movie was released, and was likely younger during its filming.

Hassan was played by a young actor named Ahmad Khan Mahmoodzada and was born in 1997. Thus, Hassan was 11 years old at the time the movie was released, and was likely younger during its filming.

Assef was played by Elham Ehsas, and his date of birth was not reported. However, it is fairly obvious in the movie that Assef is played by an actor that is clearly a minor.

The Kite Runner was rated PG-13 by the Movie Picture Rating Association. Additionally, the film employed 64 credited cast members, countless extras, and a large film crew to produce the movie. Finally, the movie was produced by Participant Productions and Sidney Kimmel Entertainment on a budget of $20M. As of 2017, the film grossed $73.2M worldwide and over $15.5M in the United States.

## The Kite Runner Violates the CPPA

This film clearly violates the CPPA. The "rape scene" of Hassan by

Assef clearly and unequivocally simulates genital to anal contact between Ahmad Khan Mahmoodzada and Elham Ehsas.

Were the U.S. to prosecute anyone for the production of this film, we would have to prove beyond a reasonable doubt that: (1) Ahmad Khan Mahmoodzada was under the age of 18; (2) that the defendant used, employed, persuaded, induced, enticed or coerced Ahmad Khan Mahmoodzada to engage in "sexually explicit conduct" for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct. See 3-62 Modern Federal Jury Instructions - Criminal, 62.01, Matthew Bender.

In order for the U.S. to prove that anyone disseminated and/or possessed this film, the government would have to prove ~~that~~ beyond a reasonable doubt that: (1) the defendant knowingly transported, shipped, distributed, received, sold, possessed with intent to sell, possessed, or knowingly accessed The Kite Runner; (2) The Kite Runner was transported in or affecting interstate or foreign commerce or The Kite Runner was produced using materials that had been transported in or affecting interstate or foreign commerce; (3) The Kite Runner involved the use of a minor engaging in sexually explicit conduct and portrays that minor engaged in that conduct; (4) the defendant knew that The Kite Runner involved the use of a minor engaging in sexually explicit conduct; and (5) The Kite Runner involved a minor who had not reached the age of puberty or was less than 12 years old.

Proving this case would be fairly easy. First, it is a known fact that

Ahmad Khan Mahmoodzada was born in 1997 and was thus only 11 years old at the time of the movie's release. There is at least one scene where Ahmad Khan Mahmoodzada appears to be forcibly raped by another boy while being held down. Thus, the Act has two definitions that apply to this sexually explicit conduct: (1) simulated sexual intercourse (genital-anal) 18 U.S.C. § 2256(2)(A)(i); and (2) sadistic abuse §2256(2)(A)(v).

Each and every person involved with making this movie could easily be charged, and likely convicted, of conspiring to produce and/or producing a visual depiction utilizing a minor engaged in sexually explicit conduct and suffer a 15-year mandatory minimum sentence.

Each and every company that has distributed the film (i.e., Blockbuster, Hollywood Video, Amazon, Netflix, etc.) and their employees could be easily with and likely convicted of distributing The Kite Runner and face 5-20 years in federal prison. To top it all off, each and every person that possessed this popular film or accessed it, with the intent to view it, is facing up to 20 years in prison as Ahmad Khan Mahmoodzada was clearly under the age of 12 years at the time the film was made.

Looking to the U.S. Sentencing guidelines, we find that the recommended penalty is astronomical in either case. For the, at least, 64 producers of this movie (the Cast), 2G2.1 is the operative guideline. The total offense level would be: 32 (base) +4 (minor under 12) +2 (distribution) + 4 (depictions of violence) +2 (supervisory control) +

2 (use of a computer) = 46. Thus, all of the defendants would receive a guideline recommendation of LIFE. Even if they were to plead guilty and receive an acceptance of responsibility reduction of 3 points, they would still face a recommendation of LIFE. If they were only charged with a single count of production, they would receive a ~~recommended 30~~ recommendation of 30 years. Quite frankly, this is absurd!

For the receivers, distributors, and possessors, their guideline would not fare very well either. For them, the operative guideline is 2G2.2. For the sake of argument, the base offense level in this hypothetical will be 22, as this the base offense level the vast ~~ma~~ majority of those sentenced under 2G2.2 will be. Thus, for the simple "traffickers" of The Kite Runner, the total offense level calculates to: 22 (base) + 2 (prepubescent minor) + 2 (simple distribution) + 4 (sadistic abuse) + 2 (use of a computer) + 2 (10-150 images ~75 images for one video) = 34. Of course for distributors like Amazon or Netflix, they would be subjected to even higher scores as distribution for pecuniary gain is enhanced at least 3 more offense levels (2G2.2(b)(3)(A)), and could conceivably be higher (Id. referencing 2B1.1 given the movie made $73.2M, an easy assumption can be made that source distributors each made over $550K and thus would increase by 14 levels). These numbers are indeed astronomical and the U.S. could conceivably lock up extremely large numbers of American people for breaking this law.

Hypothetically, were we to issue indictments to the entire film cast, director, and producers of this film, the U.S. could hand out hundreds of

years in prison for making a hit movie. Millions of Americans could conceivably be locked in the BOP for decades to come because of merely purchasing this film. See Reno v. ACLU, 521 U.S. 844, 871-872 (1997) (noting that a criminal penalty of 2 years in prison is significant "may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images.")

It is of no consequence that the government has not chosen to prosecute anyone for the creation, dissemination or possession of The Kite Runner. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige." Stevens, supra 176 L.Ed.2d at 451. The Supreme Court has made abundantly clear that an unconstitutionally overbroad statute will "not be [upheld]... merely because the government promised to use it responsibly." Id. The government's restrain has only prevented one thing; severe and rapid backlash from the film production ~~company~~ community. (Free Speech Coalition, supra (action brought by film makers once they determined the CPPA affected their permissible activities).

There can be no argument that The Kite Runner is not protected by the First Amendment. It is a work of serious artistic quality and employed actors of critical acclaim. The film presented numerous political and social issues that are present in the world today. The CPPA prohibits everyone in this country from owning, selling, or viewing this movie.

The Prince of Tides is a film that involves a man who is suffering from, what would be called today post traumatic stress disorder. Tom Wingo is brought to New York to visit with his sister's psychiatrist after another suicide attempt. Mr. Wingo's sister is suffering from a rape she was the victim of when she was 13 years old during a home invasion.

Throughout the movie, Tom Wingo starts to befriend the ~~psychologist~~ psychiatrist and agrees to privately coach her son in football. The movie unfolds as Mr. Wingo begins to face his own demons, demons that extend from the same home invasion that plagues his sister.

During a "session" which Mr. Wingo has a breakthrough, he describes the home invasion that caused the rape of his sister and mother. While he is telling the story, the camera pans to the past and shows several men invade his home, and take his sister and mother into back rooms to rape them. However, Mr. Wingo struggles with the reality that he was also victimized during the home invasion.

Tom Wingo then tells the story that he too was raped by a man during that home invasion; he was 10 years old at the time. As Tom is telling the story, the camera pans to the past again, and shows his jeans being cut off with a knife and a man raping him.

The scene is artfully done and draws on the emotions of the viewer that boys can in fact be victims of horrific rapes, and such abuse can haunt a boy for many years, just like a woman.

This scene is the "breakthrough" for Tom Wingo and an absolutely

necessary piece to the story. The abuse suffered by little Tom Wingo was horrific, sadistic, and sad. Anyone with the most frigid of hearts would cry watching this scene.

## The Prince of Tides - Statistics

The Prince of Tides stars the high ranking actors Nick Nolte and Barbara Streisand. ~~directed the film~~ Barbara Streisand directed the film, it was released on Christmas day in 1991. The movie grossed $110M worldwide and over $74.5M in the United States, as of 2017. The Prince of Tides was produced by Columbia Pictures Corporation with Barwood Films and Longfellow Pictures. The film was shot in the Charleston, S.C. and NYC areas.

Tom Wingo was played by Nick Nolte, Trey Yearwood, and Bobby Fain - depending on the scene. With regard to the "rape scene" that is shown and at issue here, the actor was Bobby Fain, who was 11 years old at the time of the movie's release to the public.

The Prince of Tides was nominated for 7 Oscar Awards and is still a very popular drama in circulation today.

## The Prince of Tides Violates the CPPA

This film clearly violates the CPPA. The "rape scene" of Tom Wingo by a home intruder clearly and unequivocally simulates genital to anal contact between the adult intruder and the prepubescent actor Bobby Fain.

Just like The Kite Runner, were the U.S. to prosecute anyone for the production of this movie, the guideline would be astronomical. Again, it would be rather easy to prove, beyond a reasonable doubt, that: (1) Bobby Fain was under the age of 18 years; and (2) that an accused (i.e., Ms. Streisand) used, employed, persuaded, induced, enticed, or coerced Bobby Fain to take part in "sexually explicit conduct" for the purpose of producing a visual depiction of that conduct. Clearly, Bobby Fain, who was 11 years old at the time the film was released and likely younger during its filming, was employed by Columbia Pictures, Barwood Films and Longfellow Pictures to produce this simulation of a sadistic rape of his ficticious character.

The same goes for those who own the movie, sell it, or otherwise access it to view it. Each and every one of them is criminally liable for possessing this video of Bobby Fain suffering a SIMULATED sadistic rape.

Again, the guidelines for this single movie would be absolutely ridiculous and produce enormous reccomendations. But, for the sake of argument, let us look at what happens when a regular person "receives" both The Prince of Tides and The Kite Runner. The guideline calculation is: 22 (base) + 2 (prepubescent minor) + 2 (simple distribution - assuming all people will allow others to view the movie with them) + 4 (sadistic material) + 2 (use of a computer) + 3 (150-300 images - 2 movies is 75+75) = 35.

It is important to take note that it is highly unlikely that Bobby Fain

would ~~b~~ even be able to acquire restitution for this sexually explicit conduct that was perpetuated against him on camera. Indeed, he would have to show that creating a smash hit movie, that made millions upon millions of dollars - in part because of him - proximately caused him some sort of injury. See Paroline v. U.S., 134 S. Ct. 1710, 1719 (2014). However, that is ok. Meanwhile, millions of Americans can be put in prison for the "pain" acting out this scene caused him.

The Prince of Tides is an artistic piece of American History and discusses very difficult and touchy subjects. There is nothing that appeals to the prurient interest in sex in this movie, (although there is a love story going on between Streisand and Nolte as well). However, there is no artistic merit exception to the CPPA. Thus, The Prince of Tides violates the CPPA, and anyone found in possession of it, or contributed to its production and/or distribution can be prosecuted. As goes without saying, the only real difference between receipt and possession is all in prosecutorial discretion. It is extremely frightening that the government could arrest virtually the entire population for purchasing this movie at some point in the past 33 years because there is no statute of limitations. (18 U.S.C. §3283; 18 U.S.C. §3299)

Bad Teacher - Synopsis

Bad Teacher is a hilarious comedy about a spend-thrift woman who was supposed to marry a very rich man, but was called off due to

her spending habits. Thus, she is forced to return to a middle school to teach children. However, she is not your ordinary teacher. Indeed, a student catches her smoking marijuana and she employs a scheme to cheat on a state test to be rewarded with a bonus.

In one specific scene, the teacher decides that she can make money by volunteering at the school's car wash fundraiser. While she is there, she washes cars while dancing around like a stripper clad in very revealing attire. The male parents that attend are elated by the dance and donate much more money than expected. The teacher hands over enough money to make the car wash a success in the eyes of the school's administration, and pockets the rest.

During the scene, the camera pans over and shows an 8th grade boy staring at the teacher dancing for the car wash. It also shows that he has an erection protruding from his pants. It is obvious that the boy has an erection and that his erection is the focal point of the film at this precise moment. However, it is unknown if it was a "simulated" erection or an actual erection. For the purposes of this Memorandum, we will proceed stipulating that it was simulated.

Bad Teacher - Statistics

Bad Teacher starred Cameron Diaz and was directed by Jake Kasdan. The film grossed over $100M in the United States and was nominated for numerous awards.

This film violates the CPPA for simulated lascivious exhibition of the pubic region of a boy under the age of 18 years. As will be discussed later, the lack of defining "lascivious exhibition" and the differing standards implemented amongs the courts to define the term, is a large contributing factor to this issue.

Were the U.S. to proceed with a prosecution of this sexual exploitation of a child, it need not prove the actual identity of the minor, (18 USC §2256 (9)(B)) and thus can proceed who the boy is whose clothed, but erect penis, is lasciviously displayed during the "Car Wash Scene." However, it does not appear that he is a prepubescent minor.

In a majority of the prosecutions for child pornography, the government brings cases of visual depictions of minors that have not actually been identified, but are "identifiable" as actual children. Therefore, this movie is infected with child pornography, and the entire movie must fall under the CPPA.

Again, a prosecution against anyone for producing, distrubiting, receiving, possessing, or accessing this movie, would result in a draconian sentence recommendation.

For the producers of this movie - including the award winning Cameron Diaz - the operative guideline is 2G2.1. The recommeded guideline for these child pornographers is: 32 (base) + 2 (12-16 year old) + 2 (distribution) + 2 (supervisory control) + 2 (use of a computer) =

40. If these criminals accept responsibility, their guideline score would reduce to 37. It is doubtful that the acceptance reward will be of any consolation to any of the producers of this child pornography, as 17.5-22 years (assuming they have no criminal history) is a really long time to go to prison for making a smash hit movie.

For the commercial distributors of this movie, their offense level is: 22 (base) + 24 (more than $100M in sales (2B1.1(b)(1)(M)) + 2 (use of a computer) = 50 (LIFE). With acceptance of responsibility, the guideline is still LIFE. However, it is unlikely a Court would ever allow 24 levels for the distribution enhancement. Even if such enhancement was reduced to the minimum 5 levels, the guideline is still 31. With acceptance of responsibility, the offense level would be 28. Assuming the distributors had no prior criminal history - six to eight years in prison is still a long time for selling such a popular movie. However, its popularity has nothing to do with whether the film depicts sexually explicit conduct involving a minor as defined in the CPPA.

Because it bears no difference that Bad Teacher is an artistic work or whether it is popular, the film simulates the lascivious exhibition of a boy under 18 and is illegal under the overbroad CPPA.

"It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling... A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." Ferber, ~~US~~ 458 U.S. at 756-57. Surely, while protecting our

youth is of the utmost importance, the Supreme Court did not intend for the CPPA's prohibition to produce such extreme results. The idea behind combatting child pornography had to do with actual harm to children, not simulated conduct that is entertaining to the masses.

Sleepers - Synopsis

Sleepers is an ~~adaption~~ adaptation of the memoir by Lorenzo Carcaterra. Mr. Carcaterra tells his story of a prank gone horribly wrong.

In "Hells Kitchen" New York, Mr. Carcaterra grew up like numerous New Yorkers - an abusive household filled with domestic violence, inseparable friends, and dog days of summer. One day, he and his best friends decide to acquire some hot dogs. These boys do not have the money for the hot dogs and devise a plan for one boy (Mr. Carcaterra) to order a hot dog, and then run when he received the hot dog without paying. The other boys were to raid the vendor's cart and steal hot dogs for each of them while Mr. Carcaterra was being chased by the vendor.

When the other boys get to the cart, they decide to take the cart as the vendor is still gaining on Mr. Carcaterra. In haste, they devise a plan to take the extremely heavy cart to the subway entrance and drop the front down the first step. This way, when the vendor caught up, he would be forced to grab the cart allowing the boys to get away.

The cart was way too heavy for the boys to hold, and it crashes

down the steps and strikes a man coming out of the subway. The boys, naturally, thought they killed the man at the bottom of the stairs.

Mr. Carcattera and his friends were charged and adjudicated delinquent by the New York State Court and sent to the reform school. This is where Mr. Carcaterra and his friends would suffer horrific physical and sexual abuse at the hands of the guards. While he was attending the school, boys were killed, raped, and even forced to eat off the floor.

Many years later, two of the boys run into their chief abuser at a restaurant. However, they are not boys any more, they are now grown gang members. Both decide to shoot their chief abuser in a crowded restaurant. They were clearly not worried about a prosecution - their anger and hatred for the abuse they suffered came pouring out through the barrels of their guns.

Mr. Carcaterra and his other friend went the opposite direction of their childhood friends. Mr. Carcaterra became a reporter and his other friend, "John," became an Assistant District Attorney for the City of New York. The story unfolds as the two friends conspire to (1) ensure their friends are acquitted for the murder and (2) ensure that all the other abusers fall too.

Throughout the movie, there are numerous scenes of simulated sadistic abuse, but one stands out more than all the others.

In a one scene, Mr. Caraterra (played by Joe Perrino) is in his room. Several guards enter the room, and inform Mr. Carcaterra that it is time for him to say his Rosary. They bend him over a table and tell him to say "Hail Mary" prayers while they pull his pants down and insert a knight-

stick into Mr. Carcattera's anus. The scene is very graphic. There are other scenes of conduct that would be considered reprehensible by any modern standard.

Mr. Carcaterra and his friends committed a crime and almost killed someone because of their actions when they were boys. Did they deserve the sadistic abuse they were forced to endure and hold secret for many years? Of course not.

The bigger question is if Mr. Carcaterra was even allowed to tell this story through the visual medium and show the world the corruption of the CPS and juvenile justice system in New York, and the entire U.S. for that matter? The CPPA says he is not allowed to.

## Sleepers - Statistics

Lorenzo Carcaterra is played by two actors. For the part of his story in question here, he was played by Joe Perrino who was born in 1982. The movie itself released on October. 18, 1996. Thus, Mr. Perrino was between 13 and 14 years old at the time of its release. The movie also featured the high ranking actors Brad Pitt, Kevin Bacon, and Robert Deniro. The movie was directed by Barry Levinson.

Sleepers generated over $53M in gross revenue in the U.S. and was nominated for an Oscar Award.

This movie certainly violates the CPPA. Joe Perrino was certainly a minor during the filming of this movie. It is very hard to tell in the movie, but we assume that the producers did not actually force a knightstick into Mr. Perrino's anus. Sadly, Kevin Bacon was directly part of this simulation of sadistic sexual abuse of Mr. Perrino.

Again, in order to prove this visual depiction violates the CPPA, all that is required to be proven is that Mr. Perrino was under the age of 18, and that the movie producers employed him to make this scene to include in this movie.

All the producers of this film are facing 15-30 years for this single scene. Certainly, all ~~others~~ the other simulations of abuse in this movie (like when all the boys were beaten because they would not give oral sex to the guards) could be used to prosecute more counts, and all the producers could conceivably receive a de facto life sentence.

Again, there is no artistic merit exception to the CPPA. There is no requirement that the government prove a minor was actually abused during the creation of the video.

## The Hunger Games - Synopsis

The Hunger Games was adapted from the book by Suzanne Collins. The story is about post-apocalyptic America following a civil uprising. The civil uprising failed and the government generated alot more power and

retaliated against the people.

In order to maintain order among the people and to prevent another civil uprising, the government passed a law mandating that two children (1 boy and 1 girl) from each of 12 districts, between the ages of 12 and 17 years, were to be randomly selected to participate in a game to the death. There could only be one winner, and that winner would be given the "luxury" of never having to work again, at least in the typical sense.

The lottery to select the children was random but tied to extra food rations. The "Capitol" ensured that each child - beginning at age 12 - would have one ballot placed in the selection box for each year. The Capitol was so restrictive on the general food and supply rations, that the children could buy a small amount of extra rations for the price of another ballot in the box. Children were forced, by the government, to choose life with food and possible death in the gaming arena, or certain death from starvation for their families or themselves.

The selection process in and of itself was sadistic. Each district's selection "ceremony" is aired nationally, and the people of the Capitol - who are never selected themselves - cheer for the beginning of the games. The people of the Capitol start to place bets on those selected to "participate" in this game to the death. Who will win or who will lose? "May the odds be ever in your favor!" The selection process obviously inflicted mental pain on the children and very scary for them.

Katniss Everdeen was not selected for the games, but her 12-year-old sister was. Despite Katniss preventing her younger sister

from receiving extra rations, her ballot was still drawn. Consequently, Katniss decides to "volunteer" and take her sister's place in the Hunger Games.

The games themselves were described by Katniss-throughout the book trilogy as "sadistic." Surely, any government as tyrannical as the one described in the Hunger Games is sadistic.

There are numerous scenes of children simulating death and destruction throughout The Hunger Games movies. In the first movie, 22 children simulate death in the arena while the people of the Capitol cheer and place bets as the "Game-makers" throw curve balls every step of the way. The Children must learn to kill or be killed in a very short amount of time and then survive a melee.

## The Hunger Games-Statistics

The Hunger Games broke the box office. The movie made nearly $408M in the U.S. from August 31, 2012 through early 2017. It was nominated for numerous awards and its cast hailed as spectacular.

The books were also extremely popular; especially among the younger generation. The first movie was released in 2012 and employed numerous real children to act as the selectees for the "games."

How in the world could this movie violate the CPPA? The Court may actually believe that Mr. Kuhl has lost his mind at this point. However, Mr. Kuhl posits that The Hunger Games indeed violates the CPPA as the CPPA does not require that "sexually explicit conduct" actually be sexually explicit. Indeed, the CPPA prohibits the creation and/or dissemination of any visual depiction that "simulates... sadistic or masochistic abuse" of real, identifiable (but not identified), children (18 U.S.C. §2256(2)(A)(iv) and (2)(B)(ii)(111)). As previously addressed, sadism and/or masochism are not limited to sexual conduct. Either word is applicable when a viewer delights in someone else's physical or mental pain (sadism) or the recipient of the painful act enjoys the pain (masochism).

Surely to take a bunch of children and place them in an arena - by the operation of law - to kill each other for the enjoyment and benefit of the government and public at large is "sadistic." Nobody in their right mind could contend otherwise.

The CPPA prohibits any sort of simulation of sadistic abuse, and The Hunger Games did so several times over. Each and every producer of this movie can be charged with production of child pornography for each and every child employed to simulate these "games." So, taking the 24 youth that were placed in the arena, each producer is facing 15-720 years by operation of 18 U.S.C. §2251(a). Indeed all these producers engaged in a conspiracy to "buy" these children by paying

their parents and the children themselves for their acting in the movie. Thus, they could be charged with 24 counts (minimum) of Selling or Buying of children for the purposes of producing "sexually explicit conduct" as defined under 18 U.S.C. §§ 2251A and 2256. Accordingly, these offenders are facing 30-LIFE. The parents of each and every one of these children are facing 30-LIFE for selling their children for the creation of this film. All of the distributors, receivers, and possessors, should they be federally prosecuted, are facing draconian sentences for this movie. How many of the offenders here are children? The movie does not have any restricted ratings and children can (and do) buy this movie for themselves.

## III FIFTH AMENDMENT

### a. Lascivious Exhibition

A lack of consistency among courts to establish a standard for the defining and applying of a statute's language can establish ambiguity, and thus provide support that a statute or portions of it are unconstitutionally vague. See Johnson v. U.S., 576 U.S. 591, 598 (2015) "The failure of persistent efforts to establish a standard can provide evidence of vagueness." (quotation simplified)

"The term 'lascivious' is not self-defining." U.S. v. Rivera, 546 F.3d 245, 249 (2nd Cir. 2008); see also U.S. v. Villard, 885 F.2d 117, 121 (3rd Cir. 1989) ("Whatever the exact parameters of 'lascivious exhibition,' we find it less readily

discernable than the other, more concrete types of sexually explicit conduct listed in section 2256(2)."); U.S. v. Hill, 322 F.Supp.2d 1081, 1084 (C.D. Cal. 2004) ("Lasciviousness is an elusive concept, and courts have struggled to develop a test for identifying it."); United States v. Brown, 579 F.3d 672, 681-82 (6th Cir. 2009) (display discrepancy and issue of establishing a standard for what is "lascivious." Finding that display of nude genitals and/or pubic area is not alone sufficient to satisfy "lascivious" requirement); U.S. v. Perkins, 850 F. 3d at 1114, 1121-22 (nude selfie of minor sitting on bed "completely nude" and who "can be seen in the image from her upper thigh area to the top of her forehead" with breasts and genital area "clearly visible" did not depict "sexually explicit conduct" as a matter of law).

"The Sixth Circuit, along with a majority of circuits, has adopted the test for 'lasciviousness' from United States v. Dost, 636 F.Supp. 828, 832 (S.D. Cal. 1986)." However, "this list is not exhaustive, and an image need not satisfy every factor to be deemed lascivious." U.S. v. Campbell, 81 Fed. Appx. 532, 536 (6th Cir. 2003). The Dost test asks the factfinder to evaluate the following six factors: 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; 3) whether the child is depicted in a unnatural pose, or in appropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and 6) whether the visual depiction is intended or designed to elicit a sexual response in

the viewer.

As noted previously, nudity is not required in all cases to constitute "lasciviousness," and all of the Dost factors need not be met. This runs afoul of the Supreme Court's repeated description of the conduct prohibited by the terms "sexual conduct" and "sexually explicit conduct" in the child pornography statutes as "hard core" sexual conduct. See U.S. v. Williams, ~~533~~ 553 U.S. 285, 296 (2008); U.S. v. X-Citement Video, Inc., 513 U.S. 64, 78-79 & 84 (1994); New York v. Ferber, 458 U.S. 747, 773 (1982); U.S. v. 12 200-Foot Reels of Super 8mm. Film, 413 U.S. 123, 130 (1973); Miller v. California, 413 U.S. 15, 27 (1973). Thus, the ordinary person cannot clearly know what constitutes "lascivious" and therefore, is not adequately notified as to what is prohibited under the CPPA.

Twerking is the most popular style of dancing for females in the hip hop culture. A lot of girls that are teenagers make twerk videos of themselves and twerk in public wearing bathing suits or "booty shorts" displaying a majority of their buttocks. Look at music videos by artists like Ice Spice, Sexy Red, and Glorilla for example. If someone in public decides to film a group of females dancing at a beach, that individual could be prosecuted, ~~because~~ if the girls are 16 or 17 years old, for producing child porn under 18 U.S.C. §2251(a), because most if not all of the Dost Factors have been met.

The focal point is on the buttocks/pubic area; twerking is sexually suggestive (look at the use of twerking in strip clubs and the context of the lyrics associated with twerking) and anyone obviously in touch with the hip

hop culture knows this; such a pose could be considered unnatural pose by differing standards and wearing booty shorts or revealing swim suits in this context could be considered inappropriate attire; and viewing girls twerking is always at least minimally designed to elicit a sexual response in the viewer. Accordingly, the vagueness of the undefined term "lascivious" encourages arbitrary and discriminatory enforcement, especially amongst the hip hop culture. Moreover, the Dost factors were established over 40 years ago and are out of touch with the reality of society today. Look to Circuit Judge Easterbrook's concurrence in U.S. v. Donoho, 76 F. 4th 588, 601-02 (7th Cir. 2023).

IV FIRST AMENDMENT

a. Lascivious Exhibition

Because twerking is a popular dance commonly used to express ones musical preferences and festivities amongst females, its commonly displayed on social media and other platforms like YouTube. The fact that viewing, sharing, or producing such videos can be prosecuted under the CPPA, renders the statute overbroad.

People should be able to freely express themselves through dancing and share that expression without fear of being punished by the federal government. Several times Mr. Kuhl has been at a local pool or the beach in South Haven on the 4th of July and seen females twerking and being recorded and some of these females are mid aged teens. This overbreadth of the CPPA infringes on the First Amendment substantially and thus, is unconstitutional.

## CONCLUSION



The CPPA has produced an absurd result. The First Amendment demands that Congress be very careful in how they proceed in enacting laws that restrict free expression, so as to avoid the result here. The Supreme Court has been exceedingly clear that the prohibition on child pornography needed to be a narrow prohibition to assure that legitimate First Amendment protections remain inviolate. As it stands right now, the U.S. can prosecute - effectively - the entire Country for violating the child pornography laws. How many Senators, Congressmen, Judges, Justices, their friends, family and loved ones are susceptible to the government's reach under this law? Does the Court wish to find out?

In Brune, the Tenth Circuit recognized "[a]n imprecise law that criminalizes access to Nabokov's Lolita or Woody Allen's Manhattan will not survive constitutional scrutiny even if it also bans actual hardcore images of underage victims." Brune, 767 F.3d at 1018.

Congress has plainly gone too far. They have had numerous oppurtunities to create a law that protects children from actual sexual abuse. They have not, yet they have continuously increased the penalties under the inadequate laws. Moreover, they have prohibited all speech on the subject of childhood abuse by prohibiting the number one medium for communicating any opinion about it. None of these movies were advocating for the abuse of children. Indeed, each movie was showing the effect of horrific abuses on children and society as a whole.

There are numerous other examples of the reach of the CPPA. Ironically, the Tenth Circuit affirmed a district court's judgment that the movie The Tin Drum was not considered child pornography, at least under Oklahoma law.

Canfield v. City of Oklahoma City, 248 F.3d 1214 (10th Cir. 2001). The Tin Drum uses an 11 year old actor to portray "activities clearly suggestive of a sexual act." Oklahoma ex rel. Macy v. Blockbuster Videos, Inc. 1998 U.S. Dist. LEXIS 22096 (W.D. Okla. Oct. 20, 1998).

It must be stated that Mr. Kuhl is not saying that the government should just allow child porn to continue to proliferate through the streets of America or the world for that matter. When children are actually harmed, it is wrong. However, there are times in our society where children are used to simulate taboo topics to make a point. Is it any wonder why A Child Called It by David Pelzer was not turned into a movie? It is pretty obvious, the only way to do this would be to show a boy between the ages of 5 and 11 being horiffically and sadistically abused to make the point of the memoir.

A great example of how the CPPA can stop a great book from being a great movie is with the book Running With Scissors by Augustren Burroughs. The movie that came out used an actor who was nearly 20 years old instead of using someone closer in age to Mr. Burroughs at the time. In the book, Mr. Burroughs was about 13 or 14. He was targeted by a pedophile and engaged in numerous sexual activities with that pedophile. The scenes were described in the book in detail. While Mr. Burroughs uses humor to make his point, the movie lost all the edge of the book. It lost its authenticity - and was not nearly as popular as the book.

~~Another stunning example of just how the CPPA can stop a great book~~

Another stunning example of the restraint caused by the CPPA is with

The Game of Thrones. The books, written by George R.R. Martin are spectacular works of fiction that utilize medieval examples of ways of life. Joffrey - the first King - was extremely abusive towards his betrothed, and he was only 12. His betrothed was only 12. "The King of the North", Rob Stark was killed when he was 16 and his wife's baby was cut out of her stomach. Bran Stark was pushed out of a window at 10 years old. Sexual acts between boys and men are described throughout the book; making pederasty part of the societal norm in "Westeros." However, when you watch the television show by ShowTime, all of the actors are easily 10 years older than portrayed in the book.

The CPPA is substantially overbroad, and for the same reasons it is also vague. There are way too many applications beyond the original intent of the protection of children for the CPPA to survive constitutional muster. Thus, Count One of the indictment must be dismissed.

Respectfully Submitted,

S. Kuhl March 28, 2025

S. Kuhl 61189510
1035 James
P.O. Box 845
White Cloud, MI 49349

S. Kuhl 61189510
1035 James
P.O. Box 845
White Cloud, MI 49349




Clerk Of The Court
U.S. Dist. Court
349 Fed. Bldg.
110 Michigan NW
Grand Rapids, MI 49503

[illegible] MAIL HAS ORIGINATED
FROM THE NEW[illegible] [illegible]TY JAIL