*IN THE UNITED STATES DISTRICT COURT*
*FOR THE WESTERN DISTRICT OF MICHIGAN*
*SOUTHERN DIVISION*

UNITED STATES OF AMERICA,

Plaintiff,

vs. Case No: 1:23-cr-44

SAMUEL ALEXANDER KUHL,

Defendant.
_______________________________/

*MOTION HEARING*

*BEFORE THE HONORABLE RAY KENT*
*U.S. MAGISTRATE JUDGE*

*Grand Rapids, Michigan*
*April 29, 2025*

APPEARANCES:

For the Plaintiff: OLIVIA KAY GHISELLI
330 Ionia Avenue NW
P.O. Box 208
Grand Rapids, MI 49501
(616) 456-2404

For the Defendant: SAMUEL ALEXANDER KUHL, Pro se

Standby Counsel: MR. SCOTT G. GRAHAM
Scott Graham PLLC
1911 West Centre Avenue, Suite C
Portage, MI 49024-5399
(269) 327-0585

TRANSCRIBED BY: Genevieve A. Hamlin, CSR-3218 RMR, CRR
Federal Official Court Reporter
110 Michigan Avenue NW
Suite 601
Grand Rapids, MI 49503
(517) 881-9582

Grand Rapids, MI
April 29, 2025
1:38 p.m.

*PROCEEDINGS*

THE CLERK: The United States District Court for the Western District of Michigan is now in session. The Honorable Ray Kent, United States Magistrate Judge presiding.

Please be seated.

THE COURT: This is 23-cr-44, United States versus Samuel Kuhl. Ms. Ghiselli on behalf of the United States. Mr. Kuhl appears pro se. Mr. Graham also appears as standby counsel.

Two matters are set for hearing. The first, Mr. Kuhl's motion to compel discovery. That appears in the Court's record at ECF 145. Ms. Ghiselli, as far as I know the government has filed no written response to the motion?

MS. GHISELLI: Your Honor, I don't believe that we have addressed this directly. I do understand, though, that Mr. Graham has made a filing in response to some of this.

THE COURT: And where would that be exactly?

MS. GHISELLI: That's ECF 144.

THE COURT: I'm not sure I've seen ECF 144. Okay. His -- yeah, his list of what -- yeah, okay. I think he provided that in response to my order, didn't he? Didn't you, Mr. Graham?

MR. GRAHAM: That's right, but before the order I had promised the government that I would prepare the same type of list, I just didn't have it done before the order entered so --

THE COURT: Okay.

MR. GRAHAM: -- it addresses both.

THE COURT: Understood. All right. So, I've read the motion. We also have up for hearing today Mr. Graham's motion for direction regarding standby function, that appears in the Court's record at ECF 159.

Ms. Ghiselli, does the government have any position with respect to that motion?

MS. GHISELLI: Your Honor, we don't have any position as to Mr. Graham's motion. I'm sure the Court is aware that, given the nature of this case, the sensitive material and some of the evidence that's involved, it is, of course, easier to coordinate and facilitate the transfer of some of the discovery to the defendant through Mr. Graham.

THE COURT: All right. Thank you, Ms. Ghiselli.

Brenda, do you have a legal pad? I seem to have come away without one. Okay. Beggars can't be choosers.

All right. So, I guess what I would propose is that we go through -- Mr. Kuhl, we go through your motion and, Ms. Ghiselli, Mr. Graham, you're welcome to chime in as we go along.

All right. So, I'm on page 2 of 4, page ID 1042, materials and actions requested. Number one, allow Mr. Kuhl to personally inspect in person the two cellphones that were subject of the January 25, 2023, search warrant.

Ms. Ghiselli, what's the government's position with respect to request number one?

MS. GHISELLI: Your Honor, we would handle this in any way that we would handle this regardless of who defendant's attorney is, whether it's a pro se individual or the attorneys themselves. To facilitate this we would require that individual to come into a government location and review the evidence in person with a representative from the government.

THE COURT: So you have no objection to Mr. Kuhl personally inspecting these two cellphones?

MS. GHISELLI: I don't have an objection to it.

THE COURT: Okay.

MS. GHISELLI: It just has to be within the confines of a government's location and under government supervision.

THE COURT: How about a government location like an interview room in the Newaygo county jail in White Cloud?

MS. GHISELLI: Your Honor, I can't speak for Special Agent Buttery who is likely the person who would have to facilitate this as to whether Newaygo or perhaps coming here to the courthouse with the holding cells here, if that would

be an option as well.

THE COURT: Yeah. That would be fine with me, I think.

MS. GHISELLI: And my other concern, just to raise before the Court, is that given the nature of the evidence in this case there is the possibility that Special Agent Buttery would be the only individual to handle the cellphone rather than handing off that phone for hand/finger inspection by the defendant.

THE COURT: Yeah. How do you make that decision?

MS. GHISELLI: Well, Your Honor, I can tell you right now I'm not comfortable with defendant personally handling the phone and touching it. I would be surprised if we allowed any attorney to do that versus viewing either the Cellebrite download or the GrayKey information or having the agent handle the touching of the phone at the direction of the defense representative, whoever that would be.

THE COURT: Whoever that may be.

MS. GHISELLI: Yeah.

THE COURT: Okay. Mr. Kuhl, is it safe to assume that you don't care -- I mean, maybe you have some slight preference about whether your inspection takes place here in this building or in a conference room or interview room in Newaygo?

THE DEFENDANT: I prefer to be able to do it in

Newaygo but either way is fine.

THE COURT: You just want to get it done.

THE DEFENDANT: Yes, sir.

THE COURT: Yeah.

THE DEFENDANT: And just to clarify, I didn't even expect to be able to go through the contents of the phone but I would like to, you know, see the extraction -- I don't want to see what they're maintaining is sexually abusive material. I would just like to see -- I've done a little bit of looking into Cellebrite and the way -- I just want to see basically how the user face -- or the user interphase or whatever, the screen pops up as they look at these materials, because there's very sophisticated features that involve AI software within Cellebrite itself that it categorizes and alerts as to things that are nudity or drugs or money or sexual conversations or fraudulent conversations or IDs and credit card images, all of these things are categorized before they are ever even opened under this Cellebrite tool and --

THE COURT: Did you provide a report, a Cellebrite report to either Mr. Kuhl or Mr. Graham?

MS. GHISELLI: Your Honor, I know that the -- if we're talking specifically about the CSAM or the photos, descriptions of those have been provided in MSP reports at minimum. I understand Mr. Graham has also gone and viewed the CSAM specific information.

I don't know that we have provided a Cellebrite report in this case. Again, just due to the sensitive nature of the materials involved in this, this is a case where we would ask defense counsel, whomever, to physically come view things either -- usually at the FBI.

THE COURT: I understand Mr. Kuhl to say that he is not asking to see any of the CSAM -- any CSAM material that may have been allegedly located on these phones, so other than that, do you see a problem?

MS. GHISELLI: No. But, again, I'm going to caveat this with the fact that even -- or this -- a barred attorney -- in other cases, the barred attorney can direct the agent or the person from the government as to what they would like to view but the individual from the government is the person who is actually doing the clicking on the screen on the computer, all of that.

THE COURT: All right. We actually have a barred attorney sitting right in the courtroom right now who's been doing this for as long as I can remember.

Mr. Graham, what's your experience in situations similar to this? Have you been allowed to handle the phone and search through the phone yourself or how does it work?

MR. GRAHAM: I've never asked to handle or search through the phone. The procedure in my experience has been this, when there is a phone that is seized, and I'll start in

general, phone is seized, I ask for a -- a mirror image of what they found, a copy of what's found on the phone. Now, I understand in a case -- I'm sorry, and then I would review that as best I could, but I would rely on an expert.

THE COURT: That would be like in a drug case or a fraud case, something other than a CSAM case?

MR. GRAHAM: It would be. Same thing would apply in a CSAM case, Your Honor, with the exception of we all know there are some images there that can never be turned over, will not be turned over, and I've had no problem with that. I would rely upon the expert to kind of provide me with guidance on how things work, and here I can tell you, Your Honor, I went to the FBI office and I asked to see generally the downloads and then to see the images classified as CSAM. Luckily, for dealing with a discovery problem, there are very, very few images that are categorized as CSAM. I think, I could have the numbers wrong, but to begin with there are a huge number of images on two phones that I was shown, I didn't go through all of them, but we're talking in the range of 60,000, perhaps, and I think -- and that doesn't even talk about text, you know, messages. The number of images categorized as CSAM I think is no more than six or seven, so in this case -- and I don't know what the process would be to redact, you know, those or to make sure that those didn't get turned over, but luckily it's a very, very small number --

THE COURT: Okay.

MR. GRAHAM: -- and so the way that I would normally do it would be to rely -- even in a CSAM case, rely on an expert.

Now, Your Honor, it is my understanding that Mr. Kuhl's kind of general approach here is what he wants to know is when phones -- when review of the phones started by forensic reviewers. He'd like to know exactly what the software does to focus that reviewer to certain images or messages or parts of what is saved on that phone because his reading shows that they don't just start, you know, scrolling through, they use software that will direct them, I don't know exactly how it does that, to certain messages or images and he would like to know, you know, how that works. I think that consultation with an expert would help him a lot.

THE COURT: But I authorized money to retain an expert. I issued two orders and, Mr. Kuhl, just so you understand why I retracted the first order and brought it back --

THE DEFENDANT: That's why I was confused.

THE COURT: -- is because I didn't want you to think that I was either expressly authorizing you to hire the expert you identified or requiring it or prohibiting it. I take no position on that. I simply gave you the money, which was the statutory maximum amount of money I could give you to retain

an expert.

THE DEFENDANT: Thank you.

MR. GRAHAM: And, Your Honor, just so the Court is aware, we are conferring about who would be the ideal expert. I've made a specific recommendation and, I mean, if it was me, it's no secret, I would use Adam Kelly, but Mr. Kuhl can make that decision, but that's in the works.

THE COURT: Okay. Great. Thank you.

So, with respect to, Mr. Kuhl, your request number one, the government doesn't oppose it, I mean, subject to certain limits, which I think you understand, so I'm going to grant that and, Ms. Ghiselli, you'll talk to the agent about timing and location issues?

MS. GHISELLI: Sure, Your Honor. My one question would be if -- if it would be worthwhile to allow Mr. Kuhl the opportunity to consult with his expert prior to that rather than potentially going in looking, speaking with an expert, having different or new knowledge and wishing to come back for a second time.

THE COURT: Yeah. Because every time the expert works on it, you know, he wants to get paid so, you know, what do you think? Mr. Kuhl, you don't have to stand up. Mr. Graham, you don't have to stand up but you're welcome to.

THE DEFENDANT: I just wanted to make sure that I was respecting Your Honor appropriately.

THE COURT: You're doing fine. No worries.

THE DEFENDANT: That's a good question. And I say here the January 2025 -- or, excuse me, 25th search warrant -- or -- yeah. There are actually -- I believe one of the phones that are an issue of the CSAM is actually a phone that was seized at a later date and never authorized to be searched by the federal government.

THE COURT: Is this either the blue Samsung or the green IPhone?

THE DEFENDANT: Yes, sir.

THE COURT: Well, that's request number three so why don't we wait until we get there.

THE DEFENDANT: Okay.

THE COURT: That's in your request number three.

THE DEFENDANT: Yep. Thank you. Okay. You're right.

MR. GRAHAM: If I could, Your Honor, for timing purposes, if Mr. Kuhl decided on Adam Kelly, I believe we could put the two of them in touch to be working on this in short order, meaning for sure by next week, if not sooner --

THE COURT: All right.

MR. GRAHAM: -- so my recommendation would be that we begin to try to pick a date that might be convenient for the agent and in the meantime try to expedite Mr. Kuhl talking with the expert and -- because I agree, we only want to do it

once.

THE COURT: Yep. And I'm not going to put -- I'm not putting my hand on the scale in terms of who you pick. You know, Mr. Graham makes a valid point, you pick an expert who's here in the community, number one, it's going to be cheaper because, you know, if you pick somebody out of state they're going to charge you for travel time to and from, right? But you do whatever you want.

So, Ms. Ghiselli, you make some -- how about you make some preliminary -- have a preliminary conversation with the case agent, try to get some dates over the next several weeks when he would be available to sit down and go through these things with Mr. Kuhl, and then I'll leave it to you gentlemen to circle back with Ms. Ghiselli or Mr. VerHey and cement a date that you want to do it.

THE DEFENDANT: Yes, sir. May I ask or clarify one thing here?

THE COURT: Sure.

THE DEFENDANT: On -- in the government's response to my expedited motion for discovery, which is electronic filing number 123 --

THE COURT: Was this the one I ruled on previously? Because they didn't respond to this filing. We're here on your motion, ECF number 145. The government filed no written response.

THE DEFENDANT: I just wanted to clarify something here because it says that Agent Buttery obtained the second search warrant -- excuse me, yeah, a second warrant for Kuhl's IPhone 12. It just seems like there were two phones that were seized in accordance with the Indiana incident and here it only mentions the Iphone 12, so I'm curious as to whether there is evidence that was removed supposedly from both phones or just the Iphone 12 or --

THE COURT: I don't know the answer to that. I don't see that you've asked that question in ECF 145, which is what we're here on. Ms. Ghiselli, do you know the answer?

MS. GHISELLI: Your Honor, that is something that I'd have to look more specifically -- given all the cellphone allegations, I'd have to look more specifically in --

THE COURT: Generally speaking, if the government had searched -- was it an IPhone 12?

THE DEFENDANT: Yes. An IPhone 12 and there was also a Samsung S21 Galaxy that was searched at this -- under this same January 25th search warrant but it only references the Iphone 12.

THE COURT: In the warrant, you mean --

THE DEFENDANT: Correct.

THE COURT: -- or, where?

THE DEFENDANT: The warrant was for two phones. However, the response here only references the Iphone 12.

THE COURT: Okay. You're not looking -- hopefully you're not looking at their response to the last motion because we've moved past that, all right? We're on to your current motion of which they've filed no written response to.

THE DEFENDANT: All right.

THE COURT: I've ruled on everything that was at play in your first motion already so I'd just refer you to my order on those.

THE DEFENDANT: Okay.

THE COURT: All right. Let's move to number two, disclose complete transcripts of texts and Facebook messages obtained from the January 25, 2023, and February 8, 2023, search warrants.

Ms. Ghiselli, what's the government's position with respect to that request?

MS. GHISELLI: Well, Your Honor, first, it just is general as to texts and Facebook messages. That is a monstrously large amount. I'm going to assume that Mr. Kuhl is probably asking for the texts and messages between himself and victim one.

THE COURT: I don't know. Let's stop right there and ask Mr. Kuhl.

Mr. Kuhl, what are you asking for here? You know, generally speaking, and I -- as borne out, I think, by Mr. Graham's description of his review, there's a massive quantity

of information in -- in most peoples -- my phone, quite frankly, I'm sure there are thousands of emails in my phone, et cetera, so most of what's on that -- we know there are six images on some device that are -- the government's relying upon as evidence against you in the case but there would be reams of other information that has nothing to do with anything, so what is it you're asking for?

THE DEFENDANT: I'm just asking for the transcripts of the messages that they allege are between me and minor one.

THE COURT: Okay. Ms. Ghiselli, what's the government's position on turning those over?

MS. GHISELLI: Sure. Your Honor, there are thousands -- I consulted with Special Agent Buttery, thousands of messages between the defendant and minor victim one. They are, given the sensitive nature of this case, fundamentally and extrinsically tied to the CSAM and the efforts to get it, and so the government -- and there's also a fairly significant amount of PII that would be incredibly difficult to redact given just the monstrous volume in those texts. There have been summaries and there have been snippets and conversations extracted out and pulled out and provided in various reports to the defendant, but that amount, those thousands of messages, it's simply not realistic to be able to pull those out.

Should that be something that the eventual expert and

the defendant wish to go through during their review of the Cellebrite or the downloads, I think that that's a wonderful opportunity to do so without having to then remove those items from the custody of the government.

THE COURT: Okay. Mr. Graham, you're here. I know -- I haven't addressed your motion yet and I promise I will before we leave --

MR. GRAHAM: Sure.

THE COURT: -- but I'm asking you now to let me hear what your thoughts are on this.

MR. GRAHAM: I think he's entitled to those. They're there. There would not be, in my understanding, a separate transcript. They could all be downloaded.

Now, certainly any PII needs to be redacted and there's a protective order in place that would deal with that anyway, but I think he's entitled to all of the communication because there's a distinct possibility it will fall into the category of something that is allegedly incriminating or something that he is going to feel is exculpatory, and so in a case like this, these are words. I don't think that they become CSAM. I understand, again, PII, I understand completely, but if this phone, the content was downloaded, even though it would be voluminous, he could have those.

THE COURT: Ms. Ghiselli, yeah, you've got to come up with a better reason than there's too many pages, because the

government turns over -- it routinely turns over terabytes of information in fraud cases and other cases --

MS. GHISELLI: Yes, Your Honor.

THE COURT: -- so the volume alone is --

MS. GHISELLI: And when those are turned over they're turned over in batch in digital form. The way this case is playing out we're not going to be giving the defendant a copy of that digital download, that mirror image for his review anywhere or any place, so this is going -- would have to be a paper production and, again, given the incredibly voluminous amount, the redactions -- now, I understand there is a protective order in place, but we will not be providing paper copies that have not been redacted to the defendant in the Newaygo jail.

THE COURT: No, I understand that.

MS. GHISELLI: Yeah. Without --

THE COURT: So you're saying --

*(Cross-talk; indiscernible)*

THE COURT: You'd have to have somebody go through and redact --

MS. GHISELLI: Yes.

THE COURT: -- thousands of pages.

MS. GHISELLI: Thousands and thousands of pages. Whereas if they are able to review it in its digital form with the custody of the FBI, that isn't necessary, and any sort of

search function or something like that would be more readily available to them.

THE COURT: All right. Mr. Kuhl, briefly.

THE DEFENDANT: I understand what they say personal identifying information. I'm curious as to why personal identifying information, this is -- that has not already been disclosed to me, Your Honor.

THE COURT: Well, it could be -- and it's not necessarily just -- obviously you know -- well, for the sake of argument, you know minor victim one's phone number or, you know, e-mail, account number, whatever. If, as the government claims, you were in communication with her you'd know those things, but there's also a question of if they give you thousands of pages of unredacted information that has her phone number, e-mail address, her parents' names, her dog's name, all this stuff, and it ends up in the Newaygo County jail in your cell where there's no security, I mean, you go down to chow and, you know, your bunky starts -- has an auction, you know? I mean, so there is a risk there that isn't posed by you but by where this -- these documents would be headed.

THE DEFENDANT: Yeah, I understand your concern. I'm only speaking from my personal experience actually being in the jail. We don't leave the cell at all. I don't go to church, which they do maybe once a week, if that. There is no

chow outside of the cell. I literally have papers that are not touched and I can move them in a tote. They don't --

THE COURT: I hear your position but I ultimately am not persuaded by it.

What we're going to do for the first -- at least for now is order that you have access to all of those texts and Facebook messages as part of the expert's review.

THE DEFENDANT: Well, just to clarify, it seems as if all of the Facebook messages have already been disclosed.

THE COURT: Well, then why are you asking for them?

THE DEFENDANT: Well, because I wanted to make sure -- certain, excuse me, that they are not withholding any, because they claimed at first that this was from May through October of 2021 but the pages that I have here stop on July 2nd of 2021 and span from April 19th and there's no request for any sexually explicit material and any Facebook message there at all.

THE COURT: Ms. Ghiselli, say something right now about this subject.

MS. GHISELLI: Well, Your Honor, I'm not -- I have no idea what he's referring to in terms of the specific messages that he's referencing. I do know that in the course of this investigation Special Agent Buttery has, again, extracted portions of this information out, whether that be text messages or Facebook material -- Facebook messages that are

relevant.

THE COURT: And it's safe to assume that when he's extracting data from this phone he's not, as a general rule, extracting Mr. Kuhl's grocery list for July 7th of 2021, he's looking for evidence and extracting information which the government may use as evidence against Mr. Kuhl?

MS. GHISELLI: Yes, Your Honor, that's correct. And I apologize, I probably used the wrong word for extraction. He's excerpting out portions of the Facebook messages or text messages to make those readily available to the defendant for review, so I am not sure if what Mr. Kuhl is referencing is an excerpted portion of those Facebook messages or not. That's -- again, given the volume, I think that is an effort by the government that I know we've done in other cases as well to provide certain important information --

THE COURT: All right.

MS. GHISELLI: -- directly to someone given the volume.

THE COURT: All right. Mr. Graham, you get the last word on this subject. If you were counsel for Mr. Kuhl would you expect to get the entirety of the Facebook messages that -- the 9,999 of them that have absolutely nothing to do with Mr. Kuhl's prosecution?

MR. GRAHAM: I would, Your Honor. And the reason is simply I don't think that any defendant needs to rely on the

government or should rely on the government to make determinations about what's relevant.

THE COURT: Okay. Ms. Ghiselli, produce paper copies of the complete transcripts of texts and Facebook messages obtained from the January 25, 2023, and February 8, 2023, search warrants.

MS. GHISELLI: Is that restricted to a particular individual, like, minor one? Is that literally every single text message? Is that -- I think we attempted to address that at the very beginning of this paragraph but for sake of our --

THE COURT: Mr. Graham.

MR. GRAHAM: I think the starting point would be minor one unless -- I mean, we might identify as the case goes on someone else involved in messages that --

THE COURT: Okay. Minor one to begin with.

MS. GHISELLI: Okay. And, Your Honor, again, these are going to be redacted.

THE COURT: Yes, of course.

MS. GHISELLI: Yes. So --

THE COURT: PII redacted.

MS. GHISELLI: For PII or for things that may potentially -- I don't know --

THE COURT: What other things would be redacted?

MS. GHISELLI: Your Honor, the CCM, if that --

THE COURT: Of course that's going to be redacted.

MS. GHISELLI: Exactly.

THE COURT: Of course.

MS. GHISELLI: I'm just making sure all parties are aware of that.

THE DEFENDANT: Excuse me, Your Honor, may I ask one thing? I apologize. I understand we've got to get going. I just wanted to clarify, it's not textual CSAM, it is specifically images that were being redacted from this, obviously. There won't be, oh, your boobs look nice, per se, or something.

THE COURT: What about that, your boobs look nice?

MS. GHISELLI: Yeah, Your Honor, that's my concern that I addressed earlier, that the text messages are intrinsically tied to the CSAM, so if you're ordering us to --

THE COURT: Tied to. Are they CSAM or are they not CSAM?

MS. GHISELLI: They're not CSAM under the statute but my concern is having this float around the Newaygo County jail, whether that's for Mr. Kuhl or otherwise, to now be reading this transcript of what the government alleges is an attempt to solicit or compliment or whatever else is going on.

THE COURT: And you can redact all reference to minor victim one in terms of her name and everything because you know who we're talking about, right, Mr. Kuhl?

THE DEFENDANT: Yes.

THE COURT: All right.

THE DEFENDANT: I'll just say that here this -- this transcript that has been given from Facebook is a complete transcript. There's not -- there's actually --

THE COURT: You don't need Facebook, is that what you're saying?

THE DEFENDANT: Well, I don't know if they're claiming that they have any other Facebook messages. Specifically they searched one Facebook and that Facebook --

THE COURT: Okay. Do you have any other Facebook messages other than the ones turned over?

MS. GHISELLI: Your Honor, I would have to look. Again, I would have to go through the entire phone and, again, are we talking minor one? I'm sorry to continue to harp on this but every time I hear the phrase every message it dings off that I'm worried about providing every message versus communications with minor one.

THE COURT: We're going to start with minor one.

MS. GHISELLI: Okay. Minor one. I will check to see what has been disclosed and go from there.

THE COURT: All right.

MS. GHISELLI: Your Honor, what's the Court's position on texts that may be, as Mr. Kuhl provided us an example, your boobs look nice?

THE COURT: Yeah. They're not -- I don't think those

are CSAM as you point out under the statute. Produce them.

THE DEFENDANT: The last --

THE COURT: You're winning, Mr. Kuhl. Mr. Graham will tell you that from long experience that when you're winning, sometimes it's a good idea to just stop talking.

THE DEFENDANT: I just want to say -- the ID specifically, to help the government, the ID of the Facebook pertaining to which Facebook I have received transcripts from is the one that is ID'd -- the only one that is ID'd on the February 8, 2023, search warrant.

THE COURT: Okay.

THE DEFENDANT: And they have that number because they have that search.

THE COURT: Okay. That's the one you want?

THE DEFENDANT: Well, that is the one that I have, that I've been provided with, and it stops on January 2nd -- excuse me, July.

THE COURT: July.

THE DEFENDANT: July 2nd of 2021.

THE COURT: All right.

MR. GRAHAM: Your Honor, can I say one last thing? I don't think we're going to solve all these problems in this one session.

THE COURT: Oh, come on. That's what I was hoping for.

MR. GRAHAM: So I think, you know, from our perspective, you know, getting a good start will let us now be able to refine future requests.

THE COURT: Good. All right. On to three, allow Mr. Kuhl to personally inspect the blue Samsung phone and the green IPhone seized by Wyoming PD on October 13, 2022. Ms. Ghiselli, any objection to that?

MS. GHISELLI: Well, Your Honor --

THE COURT: Subject to the same conditions that would apply to my ruling on one.

MS. GHISELLI: In that the -- well, again, I guess perhaps the clarification is does he want to just look at the physical phone or kind of what's going on there? I'm also not sure, Your Honor, that these are -- I -- it's unclear to me if these are the phones that are part of the CSAM investigation or if these are phones that were just part of the fraud investigation.

THE COURT: Well, if they're part of the fraud I'm not -- I won't allow it. That's a different case, different jurisdiction, different players.

MS. GHISELLI: And, Your Honor, the two phones that are being used as part of this case have been noticed in the forfeiture in the most recent superseding indictment. It's the Iphone 12 and there is a Galaxy. I don't know if I know what color it is.

THE COURT: Are those the two phones that were the subject of the January 25, 2023, search warrant?

MS. GHISELLI: Your Honor, I'd have to look. I believe so.

THE DEFENDANT: I apologize, I was speaking -- are we speaking on the green and blue Samsung right now?

THE COURT: We are, in fact, yes.

THE DEFENDANT: Those were not authorized to be searched under the January 25, 2023, search warrant. In fact, the federal government never obtained, as far as I've been provided or even have been stated, that they obtained search warrants to go through the evidence of either of those phones seized by Wyoming.

THE COURT: All right. Is the government going to be offering any evidence that was obtained out of those two phones?

MS. GHISELLI: Well, Your Honor, again, as far as I can tell they're not the two that are referenced in the forfeiture. I'm attempting to find --

THE COURT: All right. Well, we need to figure out which phones are which phones, so --

THE DEFENDANT: Right.

THE COURT: -- there's work -- as Mr. Graham points out, there's work to be done after --

THE DEFENDANT: I did a lot of digging, Your Honor.

I believe I can answer the question. The Iphone 12 -- or the Iphone referenced in the forfeiture notice I believe deals --

THE COURT: Say that again.

THE DEFENDANT: The Iphone referenced in the forfeiture allegation --

THE COURT: Is it green?

THE DEFENDANT: No, sir.

THE COURT: Okay.

THE DEFENDANT: I believe it's black. It was the Iphone from Indiana. However, the Samsung was -- I apologize.

THE COURT: Was it blue?

THE DEFENDANT: I --

THE COURT: I'm sorry about that. Maybe just sit back just a tad further. There you go.

THE DEFENDANT: The Samsung referenced in the forfeiture allegation, as far as I've been able to tell, the Samsung that was seized from the Wyoming Police Department and then turned over to MSP which MSP then turned over to the federal government.

MS. GHISELLI: Well, if that's the case, Your Honor, does it -- again, maybe I'm missing something, but it sounds like to me that falls under paragraph one in the two phones that are requested to be searched.

THE COURT: The phones -- I'll allow Mr. Kuhl to inspect with the assistance of the agent and possibly an

expert at some point down the road any phone from which evidence has been obtained and the government may use against Mr. Kuhl in this case. The phones from the fraud investigation in the fraud case are not part of this case. I'm not going to allow Mr. Kuhl access to those phones or require the government produce those phones or do anything with those phones. That's a different case in a different jurisdiction with different players and different facts and it's not part of this case.

THE DEFENDANT: Your Honor --

THE COURT: I think all of that would be irrelevant to this case.

THE DEFENDANT: I'd just like to clarify, again, there are, I believe, at least three or four phones at issue here. There were two phones, an IPhone and a Samsung, that were seized by Wyoming. They have identified, as far as they say, clearly that there was from the Wyoming stop evidence seized at least from the blue Samsung. They also claimed clearly of the two phones seized from Indiana -- I apologize, it can be a bit confusing because it's the same thing. An IPhone was seized from Indiana and a Samsung was seized from Indiana, and an IPhone and a Samsung was seized from Wyoming.

From Wyoming they claim the Samsung at least has evidence tied to this crime and from Indiana they claim the Iphone at least has evidence of this crime. However, the

January 25th search warrant referenced in number one was for both phones specifically from Indiana. They are relying on in number three the blue Samsung and the green IPhone. Specifically they're saying only the blue Samsung. However, I'm not certain that's true which is why I'm asking to review this. There's a lot of discrepancies and inconsistencies that I've found from getting chain of custody reports, police reports, the timeframes, anything -- anyways, personal knowledge. They claim that the blue Samsung for certain they recovered at least three depictions and they've given me a synopsis of those text messages in -- from that blue Samsung in the Michigan State Police report which they provided me in discovery but they didn't provide me full transcript of it.

Anyways, what I'm saying, there's four phones at issue here and all four phones may possibly be tied to this. The two phones in Wyoming were seized for fraud and supposedly uncovered sexual criminal conduct on them and they went back after learning of that from Michigan State Police by listening to a phone call. I was in the Kalamazoo County jail, they heard that I was trying to sue Wyoming police officers. Kalamazoo alongside of Buttery contacted Wyoming, Wyoming said we found evidence of fraud and we turned the phone over to MSP. They contacted MSP. MSP said, we were conducting a search for the fraud and we came across CSAM, and that's when the federal government started the federal investigation for

CSAM.

THE COURT: Thank you for the background. Any phone which contains evidence which the government may use in this case will be turned over -- you know, allowed to be inspected.

MS. GHISELLI: Yes, Your Honor.

THE COURT: Clear?

MS. GHISELLI: Yes.

THE COURT: All right. Moving on to another phone -- two phones. Are these -- so, these are the Indiana phones?

THE DEFENDANT: Yes.

THE COURT: The Iphone with the cracked screen and the --

THE DEFENDANT: Yeah.

THE COURT: Okay. My ruling applies to requests one, three, and four.

THE DEFENDANT: And two also, right?

THE COURT: Two -- I thought two was -- two was different. That's texts and Facebook messages.

THE DEFENDANT: Okay.

THE COURT: We're on to five. What exactly, Mr. Kuhl, is IMEI and ICCID?

THE DEFENDANT: The ICCID is also a SIM card number, and the reason I asked for that specifically, real quick, they claim that there was a SIM card taped to the back of the blue Samsung seized by Wyoming. I know that's not true. However,

quite mysteriously the Iphone seized from Indiana State Police is claimed to have the SIM card removed from it and -- from all the way back when it was seized by Indiana. There's these mysterious issues going on with so many phones here, I want to make sure that phones were properly searched, authorized to be lawfully searched, and they weren't just mixing up evidence in a rushed case that they were doing fraud investigations of. I want to be certain that everything is where it is supposed to be and it was done correctly, and just to quickly say under Federal Rule 16(1)(e), documents and objects, all of these materials that I'm requesting to see are materials that were obtained or taken from me and, therefore, they fall under the rule that they must be disclosed upon my request.

THE COURT: Ms. Ghiselli, government's position with respect to request five.

MS. GHISELLI: Your Honor, I'm assuming that this information will be readily available when Mr. Kuhl reviews the phones with his expert at a future date. This should all come from the Cellebrite.

THE COURT: Okay. So, granted.

The January 25, 2023, search warrant. Didn't I already rule on this in the last go round, that they turn it over?

THE DEFENDANT: At the time I had written this I hadn't had it. I have been provided with it now.

THE COURT: Okay. So we'll deny that as mute.

Seven, evidence and records logs of all evidence in this case and how such was maintained, viewed, copied, released, who maintained these records, who maintained, viewed, copied, released all the evidence including relevant dates, times such actions occurred.

Ms. Ghiselli, what's the government's position on this request?

MS. GHISELLI: Your Honor, I think it's pretty broad at this point, all evidence. Based on our ongoing conversations here I'm assuming this is in reference to the phones that Mr. Kuhl is asking for being the evidence. I'm not sure if he's -- if he's referencing, like, body worn camera as evidence or something else. If it's the phones, I believe all of that has been documented in the police reports and in the search warrants.

THE COURT: And have those been turned over?

MS. GHISELLI: Yep. The police reports and the search warrants have been, yep.

THE COURT: Okay.

MS. GHISELLI: And I just clarify, I'm not saying that the chain of custody, like, sheets of paper have been specifically --

THE COURT: Yes.

MS. GHISELLI: -- turned over but I'm saying as one

agency turned a phone over to another, I believe those all have been documented in the reports.

THE COURT: All right. Mr. Graham, thoughts on chain of custody evidence at this point in the case?

MR. GRAHAM: Your Honor, without -- if it were me making the decision, without some indication that somewhere along the way there was modification, tampering, something like that, I would not be worrying about that.

THE COURT: Okay.

MR. GRAHAM: I mean, ultimately in terms of foundation, they're going to produce evidence, images from a phone.

THE COURT: Okay. Mr. Kuhl, I think this request is just -- it's too broad, too general.

THE DEFENDANT: I may ask --

THE COURT: Therefore, I'm going to deny it without prejudice. Now, if you have a specific item of evidence that, just to use Mr. Graham's example, you know, you believe was somehow tampered with, et cetera, you know, bring a motion with respect to that piece of evidence, and if it's referred to me, I'll make a decision.

THE DEFENDANT: I'd just like to make one quick reference. I have discovered, as I mentioned earlier, quite a few discrepancies. Specifically, just one that I haven't even mentioned to the Court or anything, I realized all of these

search warrants that were executed by the federal government, never once was a return made of the evidence that was received -- or obtained. There is no inventory. There is no return, which under Rule 41, Federal Rule of Criminal Procedure is supposed to be --

THE COURT: What's the date?

THE DEFENDANT: The January 25th warrant, the February 8, 2023, warrant, the June 29, 2022, warrant, the March 8, 2022, warrant. There are no returns of inventory by the federal government on any of these search warrants.

THE COURT: Ms. Ghiselli, can you look into that? I mean --

MS. GHISELLI: I can look into it, Your Honor. This is, of course, the first --

THE COURT: Mr. Kuhl, I lost track but there's at least two search warrants that are directly at play in the case. Ms. Ghiselli, let's start there. The January 25 one for sure, 2023, there should be a return and inventory.

THE DEFENDANT: The only reason I bring up the prior ones is because they are both for the same things that were later searched on January 25th and February 8th.

THE COURT: Okay. All right. Eight, allow Mr. Kuhl to personally view and listen to any interview with MSP. Is that your interview? What interview are we talking about?

THE DEFENDANT: Yes. My interview and also I was

asking for the interview with the minor victim, which I understand you have ruled on previously saying that it's Jencks Act material that I can only use to try to impeach the minor. However, I'm trying to use it in a capacity not to impeach anyone but rather to challenge statements that were made in affidavits for search warrants due to amounts of discrepancy that I see within the MSP report, the fact that the inventories were not returned on these search warrants, the fact that I have a chain of custody report from Wyoming Police and they misstate dates that -- I was never provided with the CCU report that was done on the Samsung phone which was done before it was turned over to MSP, specifically pertaining to the extraction that allegedly evolved into the discovery of the CSAM. I found that report through means of requesting it from -- in multiple different ways from the same two agencies. I'm waiting to be received now. I think it was sent to Mr. Graham's secretary yesterday or Sunday. And I just want to be able to challenge what actually -- not only what the government says that she said to obtain the search warrants but also what the government told her that they discovered, because it -- there's an interplay here. MSP claims and the government is conceding that they came across a conversation which MSP immediately realized -- or quickly realized it could relate to sexual contact with a minor. That's referenced in ECF number 123, their response to my

request for discovery on page ID 773. And MSP Gensterbloom does state that. However, he also states that he observed -- initially observed possible CSAM, and according to Mr. Graham, he has reviewed the CSAM issue here, which brings another big point of play which I'd like to touch on also. I know we have a timeframe, obviously. Anyways, he conflates as to whether he ran across a conversation and then kept going into a conversation, the term sexual in nature, which I don't understand why he would continue to reiterate a conversation that was about high school and driver's training that wasn't automatically sexual. Anyways, then he contradicts that and says that he initially observed possible CSAM while reviewing the images of the extraction from the Samsung phone obtained by Wyoming Police Department during the traffic stop, so I want to see what he specifically told the minor that brought him to her attention, and I want to see what specifically she said to him due to these inconsistencies, because he said that she said one thing, but is he being honest?

THE COURT: Mr. Kuhl, I've already ruled -- you are entitled to a transcript or a tape recording of your own -- any interview of --

THE DEFENDANT: I would like the transcript.

THE COURT: Have you turned that over?

MS. GHISELLI: I'm not sure what video has been provided to Mr. Kuhl.

THE COURT: Mr. Kuhl's --

*(Cross-talk; indiscernible).*

THE COURT: Well, if you haven't turned it over, turn it over. If there's a transcript, he would prefer a transcript.

THE DEFENDANT: I apologize. I meant the video.

THE COURT: Oh, okay.

THE DEFENDANT: I apologize.

THE COURT: All right.

MS. GHISELLI: And, Your Honor, maybe this will be addressed at the standby counsel stage of this, but in terms of facilitating that --

THE COURT: How are you to view the video?

MS. GHISELLI: The realities of that.

THE COURT: Yeah. That's a fair question, Mr. Kuhl.

THE DEFENDANT: Right.

THE COURT: With respect to minor victim one, I've already ruled on that issue, you're not entitled to it at this point.

Okay. Number nine, the last request, disclose the texts the government intends to use under FRE 404(b), which is apparently mentioned in the pretrial conference statement. I mean, the government generally says we're not going to turn that over until later. When are you going to turn it over?

MS. GHISELLI: Your Honor, I can check the pretrial

statement to see what the date was. Usually it's two to three weeks before the final pretrial conference.

THE COURT: Yep.

THE DEFENDANT: Again, under -- again, you know, under the Rule 16 criminal procedure it supposedly obtained from me or belonged to me. I should be able to view that. It's used --

THE COURT: This is your statement? Is that what -- I don't know off the top of my head.

*(Cross-talk; indiscernible)*

THE COURT: Text message between --

THE DEFENDANT: Yes, me trying to persuade another minor, supposedly, and I would like to know specifically what that message is and what specifically I said and I would like the government to identify that that is the exact message or messages, because it quotes only one message, so I want to know specifically --

THE COURT: Ms. Ghiselli has an answer for you, I think.

MS. GHISELLI: Yeah, Your Honor. I apologize. I'm looking through what was represented on the initial pretrial conference summary statement. I'm assuming that this is going to be part of the other text messages and messages that we've been ordered to produce today so I'm assuming --

THE COURT: Assume that.

MS. GHISELLI: Yeah. I'm assuming that that will be coming forth whenever we have the opportunity to redact everything so I think that will be a nonissue.

THE COURT: All right. How long to produce that information?

MS. GHISELLI: Your Honor, I am loathed to give you an estimation.

THE COURT: Well, you're going to have to give me a estimation.

MS. GHISELLI: I mean, I'm going to ask for at least 30 days, maybe 45.

THE COURT: You're not going to get 45. If -- you know, Mr. Kuhl, somebody has to sit down and go through it page by page --

THE DEFENDANT: Your Honor --

THE COURT: -- which would be onerous.

THE DEFENDANT: -- I read all the text messages from Facebook. There isn't much more that's going to be PII than has already been disclosed to me.

MS. GHISELLI: Given the discrepancy concerns that Mr. Kuhl has expressed we are going to still have to reproduce all of the Facebook messages, even if that means it's just a duplication of what he has, and I will let the Court know that the relationship between the two parties is a year, approximately.

THE COURT: Do we have any speedy trial issues?

MR. GRAHAM: We don't, Your Honor, as far as I've evaluated things, but I think it would be beneficial if we address speedy trial today and had Mr. Kuhl waive any issues that might exist regarding speedy trial, just to have the clearest possible record.

THE COURT: All right. Mr. Kuhl, the information you're asking for, I mean, it would be lovely if we could snap our fingers, if the government could snap their fingers and produce it but obviously that's just not the case.

THE DEFENDANT: Your Honor, the government has been preparing this case for over two years. They should have this evidence separated ready to go. They've been doing all the cellphone searches, they've been doing all these things. They have the advanced technology. It's one phone number or whatever and a different phone -- however it is, they know which conversations there are.

That brings me to the point that they shouldn't even be allowed to keep any extra evidence that isn't tied to this. They can continue to just, as you say earlier, scroll through my grocery list or whatever it may be that's in this extraction data that has -- I mean, even the search warrant they provided to me, there's a message here between myself and a man that I know who's -- it's crazy -- anyways, and then a female, it's just a few messages but it's not even between --

we're talking about -- may I check out the Craftman (inaudible) toy, he said it's bad as F, excuse me, he would --

THE COURT: Okay. We're getting a little off target.

THE DEFENDANT: I'm just saying -- my point is --

THE COURT: I'm taking your response as a no. There are motions pending, however, which I don't know but I suspect have probably tolled the clock pending resolution.

MR. GRAHAM: I think you're right about that.

THE COURT: I'll give you 28 days to produce.

THE DEFENDANT: Your Honor.

THE COURT: Mr. Kuhl.

THE DEFENDANT: Thank you for allowing me to speak. I'm sorry.

Another issue that is very, very key here, and I understand I'll have to file a motion about it, but this whole seventh superseding indictment is also hindering me and delaying me, it's prejudiced me severely. They've changed the timeframe and typically they changed the word from photographs to videos. However, I've spoken with Mr. Graham and he clearly says now that he viewed at least three still photographs and before they used the word photographs and they reviewed only videos, and he says six or seven, they've only described three videos to me in this, so I'm at a loss here as to what specific depictions are at issue and what those depictions actually depict. And just to further on that, I

had a motion that has not been ruled on, which was 138, and that was a motion to show -- order to show cause why the government should not be sanctioned, you know, in that they should be able to keep producing evidence as they aren't disclosing -- you've already ruled that they were to disclose things to me for --

THE COURT: You are right, that has not been referred to me so Judge Beckering will make a decision on that motion when the time is right for her, so I can't help you with that.

MR. GRAHAM: Your Honor, the -- I want to make sure that the record is clear, I know what the images depict, those that have been identified, and I prepared a written description that is being sent to Mr. Kuhl about, you know, what they depict, a woman, you know, whatever.

THE COURT: Yeah.

MR. GRAHAM: So there's no mystery about what those images depict.

THE COURT: Well, I think that would be helpful for Mr. Kuhl to have an understanding of what the images depict so --

THE DEFENDANT: That's what I'm saying is -- okay. Now, what if Mr. Graham describes to me images that the government has not described to me or images -- or he doesn't describe to me images that the government has described to me?

THE COURT: Well, why don't we cross that bridge when

we get there. We're speaking in hypotheticals now and we have plenty of actual controversy to resolve.

THE DEFENDANT: We're there, Your Honor. He's viewed them. He can tell me typically based on his memory and I have everything that the government has given me describing four depictions -- four videos, excuse me -- no, four depictions in total. One is a still photograph --

THE COURT: That is not on the agenda today so we're not going to talk about it, but you and Mr. Graham talk about it and, you know, anybody's welcome to take any action permitted by the rules and law with respect to that but those aren't on the schedule for today.

And, Mr. Kuhl, understand, I can only do in your case what Judge Beckering instructs me to do. I can't go off and decide, for example -- I can't remember the number, 131, I can't just decide, well, I'm going to decide that, we're all here. I hear Mr. Kuhl's argument so I'm going to make a decision. I'm not authorized to do that. I'm authorized to do only what she sends me and tells me to do and that's what -- we've covered all of your motions here today. We haven't touched on Mr. Graham's yet so why don't we go there, his motion for direction regarding standby function, ECF 159. Government's already said it has no position.

Mr. Graham, you know, I know when I carved out initially what I foresaw as your role as standby it was

limited but I am willing to, you know, allow you to self define your role. Now, there are certain things, you know, that will be Judge Beckering's decisions, but for purposes of this time in the case, this period of discovery, et cetera, I can't speak to trial because obviously I won't be the judge at trial, it will be Judge Beckering, but, you know, I would invite you to describe what you see as your role.

MR. GRAHAM: Okay. And I -- I actually only have one specific, I guess, very specific request as of today and then if it would be okay if I did that as we went along and -- I mean, there is a goal here, from my perspective, which is to provide a level of assistance that will let Mr. Kuhl accomplish the things he wants but I think -- my only feeling is if someone is proceeding pro se, you know, at some point the buck stops with them and, you know, assisting in getting information -- you know, one example is this, requests have been made for money for experts. Well, we know that there's -- let's say one is going to go over that, you know, limit at various levels. There's a way to do it and I -- advising him on that I think is a classic example of what standby counsel would do.

THE COURT: Absolutely fine with me, by the way.

MR. GRAHAM: The one very specific request I have is this, over the past few years the Ingham County jail has allowed defendants in some cases to use a laptop computer to

review evidence. They have very strict requirements; the computer has to be scrubbed of everything except what might be necessary to do that, and, of course, anything that approaches any internet connection, you know, we can all imagine how that happens.

The jail has indicated that its willing to let Mr. Kuhl have access to a laptop. Now, he has to go to a room to use it. He doesn't get to take it back to his cell, et cetera, and the procedure really started when we were doing the Whitmer conspiracy case because of the volume of discovery. They've said it's okay. The marshal service has asked me to provide Mr. Kuhl with that -- with a laptop to do that and I am -- I have one that I'm actually going to pick up tomorrow that's being processed for that.

I don't want to do that without the Court's, you know, permission. What I'm asking for is permission to provide a laptop that is acceptable to the U.S. marshal service and the jail and, you know, again, they have very clear requirements and limitations, and the one additional thing I'd like to put on the computer is Word -- Microsoft Word so that he can type documents, so I would make that request to the Court, because I'm not comfortable just -- if I was self defining the role, it probably wouldn't include that.

THE COURT: Yeah. So, this laptop would have no internet access?

MR. GRAHAM: None whatsoever.

THE COURT: Okay.

MR. GRAHAM: It wouldn't have anything else except for what was necessary to view the discovery, and I know the jail would have its expert look at it. I don't know about the marshal service.

THE COURT: Yep. Permission granted.

MR. GRAHAM: Okay.

MS. GHISELLI: Your Honor, can I ask a followup on that?

THE COURT: Yes.

MS. GHISELLI: Would it have access to a printer or would there have to be someone there who approves the printing? I'm thinking in terms of being able to provide our discovery in a different format if he has access to the laptop and I want to think through any of the concerns.

MR. GRAHAM: There has never been access to a printer before.

THE COURT: Yeah. So I guess that's a no.

Mr. Graham, with respect to any other role that you want to play in the case, I'm going to leave that up to you --

MR. GRAHAM: Okay.

THE COURT: -- to make those decisions. Mr. Kuhl, remember, though, when I made the ruling that you be allowed to continue your defense pro se and I appointed Mr. Graham as

standby counsel I told him and I told you specifically that does not mean Mr. Graham is your paralegal. It does not mean Mr. Graham is your legal researcher. You know, it does not mean Mr. Graham is your investigator, so I want you to understand that, but I'm going to allow -- basically allow Mr. Graham to do as much or as little as he wants in assisting you in your defense, but don't abuse the privilege because, you know, the alternative is that I remove him as standby counsel, then you really are just swimming on your own in the ocean, which is not a great place to be.

THE DEFENDANT: I understand. I respect that, Your Honor. I just believe that -- I wonder, you know, as far as needing to investigate or anything of that nature, you know, am I allowed a paralegal or co-counsel or something to help me along those lines that can actually do that or can I move for that or am I -- I mean, the government has three, four, five attorneys that they --

THE COURT: The short answer to that question is I'm not sure. I mean, you can hire an expert because there is specific money set aside for that.

THE DEFENDANT: Correct.

THE COURT: Whether there's money set aside for a pro se defendant to hire an investigator or not, I don't know. I mean, you'd have to research that and file a motion and cite some law or rules --

THE DEFENDANT: Right.

THE COURT: -- that would permit the Court to do that, because, I mean, at the end of the day it's about the money, right, how do we pay for these things?

THE DEFENDANT: I mean, and that's --

THE COURT: We don't have discretionary money in the court.

THE DEFENDANT: I understand. And that's another thing, I mean, my family, they've been struggling a little bit, but, I mean, I don't know if they'd be able to foot maybe a small fee monthly or something to help towards anything. I don't know. My uncle lost his job recently. I haven't ordered more than two bags of honey mustard pretzels in the past seven weeks because I've been buying $9 packages of paper and stamps, so I just -- you know, I completely understand and understand that that's probably Scott's own issue, I don't know if he's being paid to come here as standby. I'm assuming --

THE COURT: He is being paid, yes. Under the Criminal Justice Act, which is what I appointed him under as your lawyer, he gets paid. There's an hourly rate. It's set by Congress and he would, as standby counsel, receive that same hourly rate. Obviously his -- you know, his billings are going to be vastly reduced, right, because his role in your case is vastly reduced, but he is paid a modest hourly rate to

act both as your principal counsel when he was that and now as your standby counsel.

THE DEFENDANT: Okay.

THE COURT: I don't know if you have -- you may have this, Mr. Kuhl, but I have in my hand a paper copy of the Court's standing order regarding discovery in criminal cases.

THE DEFENDANT: I don't have that, Your Honor.

THE COURT: Okay. It's helpful because it lays out basically what discovery should look like in a criminal case, and on the final page, page 4, paragraph P, it states, this order is designed to exhaust the discovery to which a defendant is ordinarily entitled and to avoid the necessity of counsel for the defendant filing routine motions for discovery, so I'm going to -- deputy, could you give this to Mr. Kuhl? I'm going to just provide that as a resource to you.

THE DEFENDANT: Okay.

THE COURT: As you're thinking, if you're thinking about future discovery motions, it lays out -- and I agree, and I may have even played a role in drafting it, I don't remember, it was a long time ago, but I think it lays out pretty thoroughly what you're entitled to, so if you're thinking about something and you don't see it in the list, you know, I mean, you might ask Mr. Graham what he thinks, but if you don't see it on the list and Mr. Graham says, yeah, I

don't think so, the answer is probably going to be no. I'm not telling you not to file motions, but I'm saying, you know, that will help you to bring motions which are well-founded and more likely to succeed.

THE DEFENDANT: Is this contradictory to the federal rules on discovery under 16?

THE COURT: It better not be.

THE DEFENDANT: I'm asking because --

MR. GRAHAM: It's not, Your Honor. It's not.

THE COURT: No, it's not.

*(Cross-talk; indiscernible)*

THE DEFENDANT: There was something I wanted to mention. Oh, yes. The issue with the keeping track of evidence logs and everything. I understand you say for now it's denied, but as Mr. Graham said, if I can create a -- you know what I mean, a plausible and establish a probable case of tampering or mishandling of evidence, which I truly believe I can, you know, I should be able to be entitled to that and that's just -- I just wanted to state that, that I do believe being allowed to present it, that I can present, as I said, about the inventory return just itself on every single search warrant that has been presented to me in this case as well as discrepancies in dates that the MSP claim that they received the cellphone from Wyoming PD, the specific date, and the fact that they are going in and I can prove it, they are editing

reports but not mentioning the date that they're making the edits, they are using the date as the original date that it is created, and I have the MSP procedure manual for evidence logging, I don't have it for how they're supposed to do reports, but I'm also certain that they can't just go in and change a report at a later date without making a supplementary note to that report.

THE COURT: I don't know the answer to that question, but, you know, some of these issues are issues that you may have to make at trial with a witness on the stand. So, Officer Smith, you know, I'm showing you what we've marked as exhibit -- Defense Exhibit 6, it's a copy of your report, do you recognize it? Yes. Turn to page 3. What's the date and time there? Whatever it is. Isn't it true that you made changes to this report after that date? And he answers whatever he answers, right? Maybe he says no, maybe he says yes. If he says yes, then I suppose you say, well, you know, why don't -- why is there no addendum to this report noting that it's been changed, and he gives whatever answer he gives, but some -- in other words, in the discovery process of a criminal case, the discovery process of a civil case is not designed to resolve every evidentiary issue before trial, it's designed to give the parties the information, the evidence they need to test each other's cases, and the way that ultimately those tests come down to is lawyers or pro se

defendants questioning witnesses on the witness stand and pointing out if there are discrepancies that are material to the defendant's defense; let's say, the defendant pointing out those discrepancies to the witness, you know, asking for an explanation, how can that be? So that the jury can assess -- does that make sense?

THE DEFENDANT: Yes.

THE COURT: Is that --

THE DEFENDANT: I understand.

THE COURT: Do you believe that, or not?

THE DEFENDANT: Yeah, I believe -- I understand.

THE COURT: Drill down to what is the absolute truth of any fact during discovery, and I say this to civil lawyers all the time that if we have to extrinsically prove the truth of every assertion made by both parties there would only be one case in this court until the end of time because it simply is impossible --

THE DEFENDANT: Right.

THE COURT: -- to achieve.

THE DEFENDANT: But if -- I just want to try to get clarification, if one can prove a high probability of mishandling or planting or tampering with evidence, than that is grounds to address before -- I've seen -- I don't have them off the top of my head, I've been reading into it a little bit, and that's why I'm saying this is all kind of -- I have

to research further --

THE COURT: Okay.

THE DEFENDANT: Over time I'll get something else, but so, for example, the Lyman Peter (phonetic) search warrant was allegedly for fraud and marijuana but on the last page of the affidavit it states your affiant believes the property -- items described will constitute evidence of CSC and use of a computer to commit a crime. Now, this was the search warrant that was drawn up before these filings were ever entered into which found fraud evidence by Wyoming PD and then turned over to MSP approximately two or three weeks later and then supposedly found evidence of CSC, so the affiant must be clairvoyant here --

THE COURT: Yeah, I don't -- obviously I don't know the answer to that and I don't know what -- I'm sure there is law on this area about what, you know, kinds of -- those issues are ripe for decision in a pretrial motion, and if you think that you have, you know -- I'm not telling you you can or cannot file any motion, but I would hope, Mr. Kuhl, that you would only file motions where you're confident that you're going to -- that you have a chance of prevailing, you know, and not just, hey, I'm going to run this up the flag pole and see if anybody salutes. You know the difference in those -- what I'm saying in those two kinds of arguments?

THE DEFENDANT: I understand that, Your Honor. For

example, just real quick, commerce clause challenge to either one of these --

THE COURT: If referred to me, I will read the motions, the responses, and the law, but, you know, 99 -- with 99.99 percent certainty, denied.

THE DEFENDANT: Denied. And I'm aware of that.

THE COURT: Well, you understand what I'm saying.

THE DEFENDANT: One other thing, is the pretrial motion deadline reset now or is it --

THE COURT: I don't know. There's probably an order there somewhere. I would say review the docket sheet and the answer probably exists.

MR. GRAHAM: Without a speedy trial waiver it's not going to be -- my opinion is once it begins to run again, the clock begins to run again, it's not going to get reset. That's one of the reasons to waive speedy trial is to have the better position to ask for resetting of the schedule, but, Your Honor --

THE COURT: And talk to Mr. Kuhl about that because he probably -- I mean, I'm assuming this is the first time he's defended himself. I think I asked him that question, so -- but, you know, all of your decisions have consequences, right, and so if you -- and I'm not urging you to waive the speedy trial clock, I don't care whether you do or you don't, but if you don't, you know, there may be things that you want

to accomplish, like this expert review of evidence, that doesn't get done because you run out of time, but, you know, Mr. Graham has tried I don't know how many cases in this court, a hundred, more than a hundred probably, and he can give you solid advice on that.

All right. Mr. Graham -- Mr. Kuhl, that's the last comment I'm taking from you today. Thank you. Mr. Graham, you've got one?

MR. GRAHAM: Yeah. One last point. To the extent that there's an element of self defining that's going on in the standby counsel role here, I just wanted to note for the record that in all of these cases, and this one maybe more than most, it's really easy to get lured down a rabbit hole or to miss the forest through the trees, not to abuse metaphors --

THE COURT: Yeah.

MR. GRAHAM: -- and that's the biggest -- one of the biggest mistakes anyone can make.

THE COURT: A pro se defendant makes.

MR. GRAHAM: And, you know, there are issues, the issues about what the government has to prove and so --

THE COURT: Yeah. Mr. Kuhl, Mr. Graham knows not -- he's not clairvoyant either, but he's done so many trials that I'm going to say that he could predict with high 90 percent accuracy exactly what this trial will look like, and you

should ask him that question, what's the trial actually going to look like? What witnesses are they actually going to put on? What are they likely to say, et cetera.

THE DEFENDANT: I keep hoping this won't make it trial, Your Honor.

THE COURT: Yeah. Ms. Ghiselli, any final comments from the United States?

MS. GHISELLI: No, Your Honor. I don't know if we addressed speedy. There are pending motions to dismiss so I think everything is tolled for the moment, but I don't think we addressed speedy specifically.

THE COURT: Yeah. I don't know the answer to that.

MR. GRAHAM: I think it is tolled now but --

MS. GHISELLI: Yep.

MR. GRAHAM: -- I asked about the possibility of waiving it and I understand Mr. Kuhl is not interested in that.

THE COURT: All right. I am not going to do any kind of detailed order here. It's going to be as discussed on the record. Anybody uncomfortable with that?

THE DEFENDANT: May I -- can we put on the record the exact date 28 days is from now for that to be --

THE COURT: 28 days from today, Ms. Ghiselli.

MS. GHISELLI: I got it, Your Honor. Thank you.

THE COURT: All right. Okay. We'll be adjourned.

Mr. Kuhl, good luck to you. We'll see you again, I'm sure.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: You're welcome.

*(Whereupon, hearing concluded at 2:56 p.m.)*

*C E R T I F I C A T E*

I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.

/s/ Genevieve A. Hamlin
Genevieve A. Hamlin, CSR, RMR, CRR
U.S. District Court Reporter
Grand Rapids, MI 49503