UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

FILED - GR
July 31, 2025 12:27 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JJM SCANNED BY: KD 7-31

UNITED STATES OF AMERICA,

Plaintiff,

v.

SAMUEL ALEXANDER KUHL,

Defendant.

Case No. 1:23-cr-44

Hon. Jane M. Beckering

*HEARING REQUESTED*

*EXPEDITED CONSIDERATION REQUESTED*

MOTION TO APPOINT COUNSEL

Defendant now comes before this Court requesting a hearing to address the instances of ineffective assistance of counsel creating a conflict of interest impairing Defendant from being represented by Scott Graham. It would be illogical, unfair, and unjust for Defendant to be further represented by Mr. Graham. Indeed, Defendant is seeking to be guaranteed his right to Assistance of Counsel under the Sixth Amendment, and it would be absurd to expect Mr. Graham to fairly, honestly, and effectively litigate claims of ineffective assistance of counsel against himself.

SUPPORTING LEGAL AUTHORITY

"Indeed, [counsel] would be hard-pressed to ~~argue~~ adequately argued his own ineffectiveness." United States v. Patton, 20-CR-40088-JPG (S.D. Ill. Aug. 4, 2022). The purpose of "directing supplementation of the motion for a new trial is to expose all instances of defense counsel's conduct that

might impact the ~~innefective~~ ineffective assistance claim" that is alleged by Defendant. See United States v. Villalpando, 259 F.3d 934, 937 (8th Cir. 2001).

Referencing a defendant's seeking to present ineffective assistance of counsel claims, via a Rule 33 motion for new trial, against the defendant's current counsel, the Northern District of California Court stated: "In light of the conflict of interest outlined above, the Court finds good cause for the appointment of advisory counsel solely for the ~~appointment of advisory couns~~ limited purpose of reviewing the facts of the case and advising [Defendant] regarding the potential for a claim of ineffective assistance of counsel." United States v. Rothenberg, 20-cr-00266-JST-1 (N.D. Cal. Mar. 4, 2024).

## REASONS IN SUPPORT OF MOTION

1. Today, July 23, 2025, Defendant was able to finally review Jencks Act material in full and with reasonable time. On June 21, 2025, Scott Graham's private investigator, Matt Janescki, came to the jail to go over the Jury questionnaires with Defendant. Prior to this meeting, Mr. Graham informed Defendant that Mr. Graham would meet with Kuhl over the weekend prior to trial so that Kuhl could review Jencks Act material and discuss trial strategy, answer questions Kuhl had as to trial exhibits, procedure, and witnesses. However, this meeting between Defendant and Mr. Graham never occurred, but Janescki left a

flash drive with the jail containing the Jencks material.

Defendant attempted to view the flash drive but the jail would not allow him to do so until the jail's captain screened the flash drive. The Captain did not come back to the jail until tuesday June 24, 2025, the day Kuhl's trial began. Defendant was able to view part of the Jencks material during a break at trial for approximately 30 minutes. However, the portion of the material Defendant was able to review was a 25 minute video consisting of SD's interview with MSP Detective Gensterblum. Defendant was unable to take notes as he did not have pen and paper, could not rewind or pause the video, and thus did not have an adequate oppurtunity to properly review the recording. This took place at the Federal Building, not the jail.

Today Defendant was able to view the material for the first time since trial due to the jail's continuous claim that it needed to verify with Mr. Graham that the flash drive was indeed for Kuhl. Defendant text Mr. Graham the issue weeks ago asking that Mr. Graham confirm with the jail that the flash drive was for Kuhl. Multiple times after this Kuhl attempted to view the flash drive, but the jail had not yet made it available stating they had not yet received confirmation from Mr. Graham yet. Defendant also had his uncle contact Mr. Graham's secretary asking that they verify with the jail that the flash drive was for Kuhl. Mr. Graham's secretary stated she would do so and send another copy of the drive to the jail.

Upon reviewing the flash drive, Kuhl noticed an additional flash drive was present that had been sent after the original flash drive containing the Jencks material. This additional flash drive contained a supplement to the Jencks material labeled as Jencks 2. Multiple issues came to Defendant's attention for the first time. Those issues are:

A. The MSP report stated that Gensterblum conducted the interview of SD on 11/09/22, but the bodycam interview was timestamped 10/24/22 at approximately 8AM.

B. A statement was written from Gensterblum to U.S. Attorney Ghiselli stating the interview of SD occurred on 11/09/22.

C. Gensterblum stated during the interview of SD that he was reviewing two conversations between SD and Kuhl between 5/7/22-5/31/22 and August of 2022, and specifically asking SD as to the break in communication.

D. SD unequivocally stated that the last time that she and Kuhl had any ~~time~~ type of physical personal contact or conversation in person was prior to June 2022. The unredacted summary of the SD interview of the MSP report by Gensterblum also stated this information.

E. SD stated that the relationship between her and Kuhl began within that year when it was nice outside.

F. SD stated that she had seen Kuhl later in 2022, but they did not speak, as it was just in passing as SD was with a friend.

G. SD stated that she originally began talking to Kuhl on Facebook using an android she had purchased with money from her job.

2. Kuhl has yet to receive the trial transcript, and thus cannot make an adequate review of the record to raise other grounds in post-verdict motions if reasonable. Accordingly, if appointed new counsel they would also need to acquaint themselves with trial, pretrial, and facts of the case.

SIGNIFICANCE OF JENCKS MATERIAL REVELATIONS

As to all the lettered subsections of ground no. 1 of this pleading, Mr. Graham was or should have been aware of these facts and addressed them accordingly, as well as made Defendant aware of them.

Subsection A: Mr. Graham should've raised this issue during cross-examination of Gensterblum. Further, once this was revealed, Mr. Graham

should have informed Defendant so as to raise a suppression and/or evidence admissibility challenge because Gensterblum's affidavit for the CSAM stated that he began reviewing the Samsung data on 10/26/22. Additionally, the discrepancies in the report by Gensterblum as to when Gensterblum received the Samsung Extraction from Meredith, stand to further question whether Gensterblum was intentionally trying to hide misconduct, such as exceeding the scope of the Wyoming warrant to investigate CSAM/CSC without obtaining the second warrant on 11/09/22. Such issue clearly runs afoul of the Michigan Supreme Court decision in ~~Michigan v.~~ People v. Hughes, 958 N.W.2d 98, 506 Mich. 512 (Mich. 2020).

Indeed, Mr. Graham very well knew of Defendant's "clearly indicated goal" of suppressing the evidence seized from the Samsung phone, which directly led to the evidence discovered from Facebook and the iPhone. Appointment of standby counsel's purpose, in part, is "to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of [a defendant's] achievement of his own clearly indicated goals." See McKaskle v. Wiggins, 465 U.S. 168, 169 (1984). Additionally, Mr. Graham was required to be aware of such significant and ready to act accordingly, as he was "to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." See Faretta v. California, 422 U.S. 806 (1975) (citing United States v. Dougherty, 154 U.S. App. D.C. 76, 87 89, 473 F.2d 1113, 1124-26 (D.C. Cir. 1972)).

Accordingly, addressing this issue would have resulted in a suppression of the evidence seized under the Wyoming and MSP Search warrants of the Samsung, or at least developed a better record as to Gensterblum's lack of honesty to enable the review of this issue with more scrutiny post-verdict. Indeed, it has been long accepted that late suppression motions are allowed when the defendant was not aware of the ground supporting such motion beforehand. See previous Fed. R. Crim. P. 41(e). While the rule has been amended, the removal of such lawful logic would result in withholding of evidence and facts necessary to adequately argue for suppression of illegally obtained evidence, as well as a miscarriage of justice. Indeed, such results would run afoul of due process.

Subsection B: This information could be used to substantially refute any claim that the 11/09/22 date in the MSP Incident report was a mistake. Seeing the multiple credibility issues and discrepancies in Gensterblum's report and affidavit as to when the Samsung extraction was received from Meredith, it is likely Gensterblum would try to make this type of explanation.

Mr. Graham should've addressed this matter in connection with the date of the bodycam interview of SD discussed above during his cross-examination of Gensterblum. However, Mr. Graham failed to do so.

In connection with the statement from Gensterblum to U.S. Attorney Ghiselli, Gensterblum attempts to make it seem as if Defendant

conflates the substance of the Wyoming report with the Samsung Extraction, in addressing Defendant's arguing the discrepancies in the MSP Incident reports as to the date Gensterblum took possession of the extraction from Meredith. However, Defendant conflated nothing at all. Indeed, the fraud MSP report clearly lists the flash drive containing the extraction was received on 10/31/22, but the MSP CSAM report clearly states receiving the extraction on 10/28/22. This becomes very substantial when taken into consideration with the date of the interview of SD actually being 10/24/22, and CSC being on the affidavit of the Wyoming PD Detective April Kroschel.

Not being able to review and address these matters violated due process and the Giglio and Brady doctrines. It is quite disturbing that Mr. Graham did not present this material information to Defendant, nor address it at trial.

Subsection C: This is material because it completely refutes the argument presented by the Government's response to Kuhl's suppression motion, because the texts attached to that response were from June of 2022, and a different number than the text strings of 5/7/22-5/31/22 and August of 2022. Thus, these texts could not have been the basis of the continuous searching by Gensterblum as the Government claims.

Again, Mr. Graham knew of Kuhl's clearly indicated goal of seeking suppression of the evidence seized from the Samsung, and ~~asked~~ Kuhl

asked Mr. Graham for help articulating a corresponding argument. Further, had Mr. Graham been truly enabling himself to represent Kuhl at any time if need be and staying up to date with the case, Mr. Graham would've noticed this issue and presented it to the Court or Defendant.

Also, the numbers associated with the 5/7/22-5/31/22 text string and the August text string were two different numbers. This should have raised further flags as to Gensterblum going on a complete search of the data for CSAM and had indeed already read the texts, and viewed the videos charged. Indeed, the three videos introduced at trial were timestamped as being received on the Samsung in May and August of 2022. The other video was in 2021 from the iPhone. However, Mr. Graham again dropped the ball on this matter.

Subsection D: This clearly negated the Government's theory that it was SD and Kuhl at the South Haven Baymont Inn on August 24, 2022. Which theory was already lacking due to no one seeing SD or Kuhl at the hotel, SD not being aware of Kuhl using the alias Michael Polito, no messages being presented on 8/23/22 - 8/25/22 at trial, and SD not being able to recall when she ~~went~~ went to the hotel with Kuhl.

Had Mr. Graham been truly prepared to take over trial and seeking to assist Defendant, this information would have stuck out in Mr. Graham's mind and he would have brought it to Kuhl's attention.

Subsection E: Gensterblum interpreted this to mean that SD and Kuhl met each other in 2022 and he relayed as much to Special Agent Buttery. All of Gensterblum's actions coincide with this being his assumption: The unredacted portion of Gensterblum's report, which Kuhl saw for the first time today, shows that Gensterblum sought records from Baymont Inn going back to 3/1/22; Gensterblum got a search warrant for SD's Facebook account going back to January 1, 2022; and the report stated the crime occurred on or about 1/1/22 and after. Clearly Gensterblum believed SD and Defendant's relationship began in 2022.

The signifcance lies in the fact that this is what was relayed to SA Buttery who obtained the Federal search warrants on 1/25/23 and 2/8/23. To believe that Buttery remembered exactly which of Kuhl's three Facebooks specifically contained messages with SD is ridiculous. Indeed, Buttery searched three accounts associated with Kuhl 11 months prior to the 2/8/23 search warrant on or about 3/8/22, as well as three other Facebook accounts associated with other people. Who is to tell how many other Facebook accounts, related to separate investigations, that SA Buttery searched in this 11 month span. Yet he knew the exact Facebook associated with Defendant which had messages between Kuhl and SD.

What truly happened, and the reason why the Government and Court colluded to keep Buttery away from the case, is that Buttery went back through the data stored under the Fraud search

warrants to look for communications with SD in pursuing the suspected sex crimes. This was in violation of Fed R. Crim. P. 41(e)(2)(B), because Buttery's review of the data was not consistent with the original search warrants for fraud. Moreover, Buttery's review of the data to search for evidence of an unrelated crime, without obtaining a new warrant, violated the Fourth Amendment.

"[We begin by considering whether Rule 41 was in fact violated. If so, we typically proceed by determining whether that specific Rule 41 violation rises to the level of a Fourth Amendment violation." United States v. Krueger, 809 F.3d 1109, 1113 (10th Cir. 2015). Here, the review of the data seized under the previous federal warrants on 3/8/22 and 6/29/22 for an unrelated crime was a Rule 41 violation rising to the level of a Fourth Amendment violation. To conduct a warrantless search is to do so unreasonably and without probable cause, which is exactly what Buttery did. The Fourth Amendment generally requires police to obtain a warrant before searching property. See California v. Carney, 471 U.S. 386, 390 (1985).

This Rule 41 violation was further unconstitutional because it exceeded the scope of the original warrants for fraud. "A search ~~warrant~~ pursuant to a valid warrant may devolve into an invalid general search if the officers 'flagrantly disregard... the limitations of the search warrant.'" United States v. Garcia, 496 F.3d 495, 507 (6th Cir. 2007) (quoting United States v. Lambert, 771 F.2d 83, 93 (6th Cir. 1985)). Buttery went on a general rummaging through the data looking for any

communication with SD unrelated to the fraud evidence authorized to be searched for, then when and got additional warrants.

Even if it is determined that this violation did not rise to a level of unconstitutionality, suppression would have still been warranted. This is because: 1) the Rule 41 violation resulted in prejudice that the search for evidence of sex crimes by Buttery might not have occurred; and 2) Buttery's conduct was an intentional and deliberate disregard of the (e)(2)(B) provision of Rule 41. See Krueger, 809 F.3d at 1114, citing United States v. Pennington, 635 F.2d 1387, 1390 (10th Cir. 1980).

The prejudice occurred because Gensterblum did not believe nor relay to Buttery that SD and Kuhl's relationship began before 2022. Accordingly, without Buttery going back through the data looking for any communication between Kuhl and SD, to fabricate his assertion he remembered seeing such communications during his prior search, Buttery would have lacked probable cause to obtain the additional warrants.

Due to Buttery knowing this, he intentionally reviewed the data in a manner, and for a purpose, inconsistent with the original warrant to locate the communications with SD, if any, to be able to make a sufficient application for the additional warrant. This is the intentional and deliberate disregard for Rule 41(e)(2)(B).

This key information could've been honed in on by a thorough review of the Jencks material, which Kuhl was not afforded an oppurtunity to do. However, Mr. Graham had the oppurtunity, and knew of Kuhl's clearly indicated goal of seeking avenues to suppress evidence. Thus,

Kuhl's inability to fully and adequately review the Jencks material, and Mr. Graham's inexcusable failure to do so, violated Kuhl's due process rights to fully litigate material issues. It also violated his right to present his defense, and confront witnesses under the Sixth Amendment. Had Kuhl been aware of this information before, or during trial, as either was possible due to Mr. Graham having the Jencks as early as the Friday before trial, Defendant would have had additional grounds to seek Buttery as a witness.

Subsection F: This specific and unequivocal assertion by SD that she did not speak personally or physically interact with Kuhl after June 2022 provides further negating evidence as to the government's theory that Kuhl and SD had sex on 8/24/22 at the Baymont Hotel in South Haven. Yet Mr. Graham did not elicit testimony from Gensterblum to illuminate this material information during cross-examination. Due to the lack of evidence pertaining to the 8/24/22 incident specifically, bringing this information to light likely would have effected the verdict.

Subsection G: This information would have stood to discredit SD and disprove the government's theory Kuhl was fueling the initial enticement of SD and recklessly disregarding easy warning signs that SD was not 17, because SD had no phone and Kuhl bought her one. Coupled into this theory by the government, was that SD used

iPhones, purchased by Defendant, to produce the depictions underlying Count 1.

## CONCLUSION & RELIEF SOUGHT

For the reasons addressed within this pleading, and the other instances of ineffective assistance of counsel, erroneous Court rulings, misconduct by the prosecution, and errors at trial, Defendant requests an immediate hearing to address these matters.

Further, Kuhl seeks the appointment of counsel to help investigate and litigate these issues. Due to the conflict of interest brought by the claims of ineffectiveness, as well as the tension, hostility, animosity, and complete lack of trust between Kuhl and Mr. Graham, Kuhl requests that the appointed counsel not be Mr. Graham.

Seeing as Defendant has not yet received the transcript of trial, the possible appointment of new counsel, and the time required for review of the transcript by Kuhl, as well as time to review, discuss, and address the entirety of this case, discovery, trial, and pretrial rulings and motions with new counsel, Defendant requests a second extension of the post-verdict motion deadline as the Court deems appropriate.

Respectfully,

S Kuhl 7/23/25

S. Kuhl 61189510

S. Kuhl 61189510
1035 James
P.O. Box 845
White Cloud, MI 49349






U.S. Dist. Court
399 Fed. Bldg.
110 Michigan NW
Grand Rapids, MI 49503

LEGAL MAIL

"This mail has originated from the Newaygo County Jail"